IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2008 Session

## DIANE DOWNS EX REL. RYAN CODY DOWNS  v.  MARK BUSH ET AL.

**Appeal by permission from the Court of Appeals, Middle Section
Circuit Court for Davidson County
No. 04C470     Barbara N. Haynes, Judge**

_____

**No. M2005-01498-SC-R11-CV - Filed September 10, 2008**

_____

We granted the plaintiff's application for permission to appeal in this wrongful death case to determine whether the trial court properly granted summary judgment to each of the defendants. The Court of Appeals affirmed the grant of summary judgment. Although the parties have raised several issues in this appeal, the central issue is the nature of the legal duty, if any, owed by the defendants to the plaintiff's decedent. The decedent was socializing and consuming alcohol with the defendants. While riding in a four-door pick-up truck with the defendants, he became ill. The defendants stopped the truck on the side of an interstate highway so the decedent could vomit. After resuming the trip, the decedent rode in the bed of the truck and, for reasons unknown, exited it. After exiting the truck, he was struck by two vehicles and subsequently died. Upon careful review of the record and applicable authority, we conclude that there are genuine issues of material fact as to whether the defendants placed the decedent in the bed of the truck. Similarly, we conclude that there are genuine issues of material fact as to whether the decedent was helpless and whether the defendants took charge of him. Lastly, we hold that none of the defendants stood in any special relationship with the plaintiff's decedent and consequently they did not assume any affirmative duty to aid or protect him. We therefore reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals is Reversed and Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK and GARY R. WADE, JJ., and FRANK F. DROWOTA, III, SP.J., joined. JANICE M. HOLDER, J., concurring and dissenting.

Donald N. Capparella, Charles P. Yezbak, III, and Amy J. Farrar, Nashville, Tennessee, for the appellant, Diane Downs.

C. Benton Patton and Christopher M. Jones, Nashville, Tennessee, for the appellee, Mark Bush.

W. Bryan Brooks and Alisha M. Toll, Nashville, Tennessee, for the appellee, Ryan F. Britt.

R. Kreis White, Brentwood, Tennessee, for the appellee, Jerry Dane Eller.

Barry L. Howard and Melissa Bradford Muller, Nashville, Tennessee, for the appellee Scott Hurdle.

Samuel R. Anderson, Chattanooga, Tennessee, for the Amicus Curiae, The Property Casualty Insurers Association of America.

## OPINION

### Standard of Review

This wrongful death case came to this Court following the trial court's grant of summary judgment to each of the defendants, which the Court of Appeals affirmed. Summary judgment is appropriate when the moving party establishes that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law. Tenn. R. Civ. P. 56.04; West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 550 (Tenn. 2005); Penley v. Honda Motor Co., 31 S.W.3d 181, 183 (Tenn. 2000); Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993). In reviewing a motion for summary judgment, we construe the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the non-moving party. Mooney v. Sneed, 30 S.W.3d 304, 305-06 (Tenn. 2000). A trial court's grant of a motion for summary judgment presents a question of law which this Court reviews de novo without a presumption of correctness. Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007).

A party is entitled to summary judgment only when "the facts and conclusions to be drawn therefrom permit a reasonable person to reach only one conclusion." Seavers v. Methodist Med. Ctr., 9 S.W.3d 86, 91 (Tenn. 1999). While summary judgment is an efficient means of deciding cases dependant solely on questions of law, see Brookins v. Round Table, Inc., 624 S.W.2d 547, 550 (Tenn. 1981), "it should not replace a trial when disputed factual issues exist, because its purpose is not to weigh the evidence, to resolve factual disputes, or to draw inferences from the facts." Rollins v. Winn Dixie, 780 S.W.2d 765, 767 (Tenn. Ct. App. 1989) (citing Jones v. Home Indem. Ins. Co., 651 S.W.2d 213, 214 (Tenn. 1983)) (internal citations omitted).

### Factual and Procedural Background

The following facts are presented in a light most favorable to the non-moving party, the plaintiff. This lawsuit arises out of the death of eighteen-year old Ryan Cody Downs, who died after being struck by two vehicles on Interstate 65 in Nashville, Tennessee. During the evening hours of Saturday, February 15, 2003, Mr. Downs along with five other young men came together at his apartment for a night of socializing, including consuming alcohol. Mr. Downs was joined by Ryan

Britt, Mark Bush, Jerry Dane Eller, Kevin Deans,[1] and Scott Hurdle. Mr. Downs, Mr. Britt, Mr. Bush, and Mr. Eller were all classmates at Nashville Auto Diesel College ("NADC"), and Mr. Deans and Mr. Hurdle were in Nashville visiting from Mr. Downs' and Mr. Britt's hometown in North Carolina.

Mr. Downs and Mr. Britt were longtime friends who had grown up together in North Carolina. Mr. Britt testified in his deposition that he and Mr. Downs consumed alcohol almost every weekend since they were fifteen or sixteen years old and that when Mr. Downs was drinking alcohol, "he would never be satisfied until he had had too much." Mr. Britt stated that he could tell when Mr. Downs was "drunk" because of his "stumbling, talking, [and] his actions." Mr. Britt described Mr. Downs as "wild." For example, Mr. Downs' antics included causing water pipes to leak in class, placing "a Playboy picture in the teacher's desk [and] tak[ing] the barrel off of a dust collector and throw[ing] sawdust all over people." Moreover, Mr. Downs had been arrested previously for underage consumption of alcohol and helping Mr. Britt spray paint a Confederate flag and noose on a water tower.

After high school, Mr. Britt and Mr. Downs enrolled in NADC. While attending school, they shared an apartment on Glastonbury Drive. Mr. Britt invited Mr. Hurdle and Mr. Deans to visit Nashville and to spend the weekend with him and Mr. Downs at their apartment. At approximately 7:00 pm on that Saturday, Mr. Britt also invited Mr. Bush and Mr. Eller to join them. Even though Mr. Downs, Mr. Britt, Mr. Bush, and Mr. Deans were all under the legal drinking age of twenty-one, they and Mr. Hurdle consumed alcohol. Specifically, Mr. Downs was drinking "Seagram's Seven." Mr. Eller, however, did not consume any alcohol that night. At some point during the evening, Mr. Downs suggested that the group go to a party at an apartment near the Cool Springs mall in nearby Franklin, Tennessee. The group agreed to ride in Mr. Hurdle's four-door pick-up truck, and Mr. Eller agreed to be the designated driver because he had not been consuming alcohol. Mr. Britt observed that Mr. Downs was acting "wild" and "hollering a little bit, screaming a little bit" when the group left the apartment. Furthermore, Mr. Britt opined that Mr. Downs was the most intoxicated member of the group.

The group traveled south on Interstate 65 to the Cool Springs mall-area in search of the party.[2] Some members of the group brought alcoholic drinks along for the trip, one of which either Mr. Downs or Mr. Deans spilled on the back-seat of the truck. Eventually, the group found their destination. However, when they entered the apartment they discovered that there was no party but

---

[1] Mr. Deans, Mr. Downs' half-brother, was not named as a defendant in this case.

[2] While searching for their destination within the apartment complex, the group saw a party going on at another apartment and, even though he did not know anyone at this party, Mr. Deans decided to exit the truck and attend that party instead of the one that the group was seeking. Mr. Deans did not return to Mr. Downs' and Mr. Britt's apartment until sometime after the remainder of the group returned to the apartment.

only one woman, the tenant.[3]  According to Mr. Britt, Mr. Downs continued to consume alcohol once they reached the apartment and was becoming more intoxicated as the night progressed.  Not long after entering the apartment, Mr. Downs became belligerent, destructive, and obnoxious.  Mr. Eller described the situation as follows in his deposition:

> This is at the point when [Mr. Downs] started to act up . . . . When we all got there and everybody went in, he was normal, fine, standing there with the rest of us.  The next minute, he feels like he needs to run through this lady's house that we don't know and go in her bedroom and shut the door. . . .  And then he would come out and then just stood [sic] there with the rest of us. . . . and then he would do something else.

That something else included spilling a drink on the floor and knocking over some personal property.  At that point, the tenant insisted that Mr. Downs leave her apartment.  Mr. Britt attempted to take Mr. Downs' alcoholic drink away from him, but he resisted.  Mr. Britt stated in his deposition that "[h]e was kind of fighting me over the glass and said if we didn't let him have it, he was going to tear her house all to pieces, as we were leaving."  As the group left the apartment and were walking back to the truck, Mr. Downs kicked the front doors of several neighboring apartments.  The group got back in the truck and again Mr. Eller drove while Mr. Hurdle sat in the front-passenger seat.  Mr. Downs sat in the middle back-seat with Mr. Britt on his left behind the driver's seat and Mr. Bush on his right behind the passenger's seat.  The group decided to return to Mr. Downs' and Mr. Britt's apartment.  During the return trip on Interstate 65, Mr. Downs became nauseous and started to "dry-heave."  Mr. Eller stopped the truck on the side of the interstate highway and Mr. Downs along with Mr. Britt, Mr. Bush, and possibly Mr. Hurdle,[4] exited the truck.  As he was exiting the truck, Mr. Downs broke off a piece of the truck's plastic molding.  Once out of the truck, Mr. Downs vomited on the side of the road.

After vomiting, Mr. Downs continued the return trip in the bed of the truck.  However, the parties dispute whose idea it was for Mr. Downs to ride in the bed of the truck and whether the defendants helped "put" him there.  With respect to any conversations about Mr. Downs riding in the bed of the truck, Mr. Bush and Mr. Hurdle testified in their depositions that none of the defendants discussed Mr. Downs riding in the bed of the truck.  Conversely, Mr. Britt stated that it was a "group decision."  Moreover, according to Mr. Eller's deposition, Mr. Hurdle and Mr. Britt discussed Mr. Downs riding in the bed of the truck.  Additionally, Mr. Eller stated in his statement

---

[3]  It is unclear from the record how or if Mr. Downs knew the tenant.  The plaintiff testified in her deposition that when she spoke to the tenant, she told the plaintiff that she did not know Mr. Downs or any other member of the group.

[4]  Mr. Hurdle stated in his deposition that he did not exit the truck; however, Mr. Eller testified that Mr. Hurdle did, in fact, exit the truck.

to the police officers investigating Mr. Downs' death that Mr. Hurdle wanted "to put [Mr. Downs] in the back so he wouldn't vomit all over the truck."[5]

Likewise, the record is unclear whether the defendants assisted Mr. Downs into the bed of the truck, physically put him there, or whether he voluntarily agreed to ride there. Mr. Britt stated that he helped Mr. Downs, but that Mr. Downs climbed into the bed under his own strength. In other words, Mr. Britt did not physically grab Mr. Downs and lift him up into the bed of the truck. Mr. Hurdle's testimony supports Mr. Britt's statement. Mr. Bush, on the other hand, testified that Mr. Britt did not assist Mr. Downs, but that he only shut the tailgate after Mr. Downs climbed into the bed of the truck. Mr. Bush, Mr. Britt, and Mr. Eller agreed that Mr. Downs did not object to riding in the bed of the truck.

In their statements to the investigating police officers, the defendants made the following statements: Mr. Britt stated that he "put [Mr. Downs] in the bed of the truck." Similarly, Mr. Bush stated that Mr. Britt "opened the tailgate and put [Mr. Downs] in the back." Mr. Hurdle stated that Mr. Britt "said put [Mr. Downs] in the back and [Mr. Britt] helped him into the back." Lastly, Mr. Eller stated that Mr. Britt "helped him get into the back." Regardless, of whose idea it was or whether the defendants helped or physically put Mr. Downs in the bed of the truck, it is undisputed that he continued the return trip alone and unrestrained in the bed of the truck.

 Shortly after resuming the trip, Mr. Downs started beating on the truck's rear window. Mr. Eller began to pull the truck over a second time when he was advised by another member of the group to continue driving because Mr. Downs had either sat or laid back down in the bed.[6] Likewise, the parties disagree whether Mr. Eller came to a complete stop or not.

At some point after resuming the trip, the members of the group realized that Mr. Downs was no longer in the bed of the truck. No one in the group knew when, why, how, or where Mr. Downs had exited the bed of the truck. The group returned to the apartment and began searching for Mr. Downs at the apartment complex, believing that perhaps he had jumped out of the bed near the apartment complex and was playing a prank on them. No one went looking for Mr. Downs or contacted the police.

The record does not reveal what happened to Mr. Downs after he exited the bed of the truck until he was observed by Melissa Barrell, one of the passengers in the first vehicle that struck him

---

[5] In his deposition, Mr. Hurdle denied saying that he wanted Mr. Downs to ride in the bed of the truck to avoid Mr. Downs vomiting in his truck.

[6] Mr. Eller testified in his deposition that he could not see Mr. Downs once he was in the bed of the truck because of a toolbox and dark tinting on the rear window.

on Interstate 65. Ms. Barrell testified by affidavit that as she and her husband,[7] the driver, were traveling north on the interstate highway, she saw Mr. Downs approximately ten to fifteen feet ahead of their vehicle on the side of the road and that he was crouched in a "runner's stance." Mr. Downs then ran into their lane of traffic. Immediately upon seeing Mr. Downs run into their lane, Ms. Barrell yelled out to her husband, who swerved, but unfortunately struck Mr. Downs. The vehicle behind the Barrell's vehicle also struck Mr. Downs. Ms. Barrell called 9-1-1, and Mr. Downs was taken to Vanderbilt University Hospital where he subsequently died as a result of his injuries.

Mr. Downs' mother, Diane Downs, filed this lawsuit seeking damages for the wrongful death of her son alleging that the defendants intentionally or negligently put him in the bed of truck. Additionally, the plaintiff claims that the defendants' conduct constituted the tort of outrageous conduct.[8] Each of the defendants filed a motion for summary judgment. Generally, the defendants argued that they did not owe or breach any duty of care, and that even if any duty of care was owed and breached, Mr. Downs' act of running into a lane of traffic was an independent, intervening cause that negated an essential element of the plaintiff's claims. The trial court granted summary judgment to each of the defendants on both claims. The orders granting summary judgment, however, did not provide any legal grounds upon which the motions were granted.[9]

The Court of Appeals affirmed the trial court's decision to grant summary judgment to each of the defendants. The intermediate appellate court concluded that only the driver, Mr. Eller, and the owner of the truck, Mr. Hurdle, owed Mr. Downs a duty of care. The court went on to hold that there was no basis to support a conclusion that either of these defendants breached his duty of care. In addition, the Court of Appeals held that the trial court could also have properly dismissed the plaintiff's lawsuit because Mr. Downs' act of running into a lane of traffic was an independent, intervening cause that negated an essential element -- proximate or legal cause -- of the plaintiff's claims.

The plaintiff appealed and raised a number of issues related to the nature of the legal duty owed by the defendants to Mr. Downs. The plaintiff argues each of the defendants breached a duty

---

[7] Mr. Barrell was originally named as a defendant in this lawsuit, but the trial court granted his motion for summary judgment and the plaintiff did not appeal that decision.

[8] In her application for permission to appeal, the plaintiff did not present the issue of whether the trial court erred in granting summary judgment to each of the defendants with respect to the outrageous conduct claim. However, she did brief the issue and the defendants responded in their briefs. According to Tennessee Rule of Appellate Procedure 11(b), the application for permission to appeal "shall contain: . . . (2) the questions presented for review." We conclude that the plaintiff abandoned this issue on appeal to this Court because she did not present it in her application for permission to appeal. However, even if she had properly presented the issue, the Court of Appeals correctly affirmed the trial court's decision to grant the defendants' motions for summary judgment on the outrageous conduct claim.

[9] Effective July 1, 2007, Tennessee Rule of Civil Procedure 56.04 was amended and now provides: "The trial court shall state the legal grounds upon which the court denies or grants the motion which shall be included in the order reflecting the court's ruling."

of reasonable care because they helped "put" Mr. Downs in the bed of the truck. She reasons that this act created a foreseeable and unreasonable risk of harm to her son. Moreover, the plaintiff contends that all of the defendants assumed an affirmative duty to aid or protect Mr. Downs because he was helpless and they took charge of him. Lastly, the plaintiff insists that Mr. Britt, Mr. Eller, and Mr. Hurdle assumed an affirmative duty to aid or protect her son because they each stood in a special relationship to him.

We granted review. For the reasons set forth below, we hold that the trial court erred in granting summary judgment to each of the defendants. The question of whether the defendants helped "put" Mr. Downs in the bed of the truck is a genuine issue of material fact that precludes summary judgment in this case. Similarly, we hold that the questions of whether the defendants took charge of Mr. Downs and whether he was helpless are genuine issues of material fact that preclude summary judgment as well. These facts are material because they determine the nature of the legal duty owed by the defendants to Mr. Downs. However, we disagree with the plaintiff that Mr. Britt, Mr. Eller, and Mr. Hurdle assumed an affirmative duty to aid or protect Mr. Downs, because they did not stand in any special relationship with him.

## Duty Principles Under Tennessee Law

### A.

In order to prevail on a claim of negligence, the plaintiff must prove by a preponderance of the evidence the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." West, 172 S.W.3d at 550; see also McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995). The question in this appeal centers on the duty of care, if any, owed to Mr. Downs.

A duty of care is "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." McCall, 913 S.W.2d at 153. The common law has long recognized that an individual has a duty to exercise reasonable care in his or her activities in order to prevent unreasonable risks of harm from arising. West, 172 S.W.3d at 550; Draper v. Westerfield, 181 S.W.3d 283, 291 (Tenn. 2005); Doe v. Linder Constr. Co., 845 S.W.2d 173, 177 (Tenn. 1992). The duty of reasonable care acts as a restraint upon an individual's activities. See Turner v. Jordan, 957 S.W.2d 815, 818 (Tenn. 1997) (stating that generally "a person has a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others.").

While individuals have an obligation to refrain from acting in a way that creates an unreasonable risk of harm to others, the law generally does not impose on individuals an affirmative duty to aid or protect others. Draper, 181 S.W.3d at 291; Bradshaw v. Daniels, 854 S.W.2d 865, 871 (Tenn. 1993); Restatement (Second) of Torts § 314 (1965). In other words, where an alleged tortfeasor does nothing to create or allow an unreasonable risk of harm, but instead the complaining

-7-

party himself or herself creates the unreasonable risk or voluntarily assumes an unreasonable risk, there is no duty on the part of the alleged tortfeasor to take action to prevent the harm. However, Tennessee courts have consistently recognized exceptions to this "no duty to act" rule. Bradshaw, 854 S.W.2d at 872; McClung v. Delta Square Ltd. P'ship, 937 S.W.2d 891, 904 (Tenn. 1996); Restatement (Second) of Torts § 314A. For example, if an individual stands in a special relationship to another individual who is the source of the danger or who is foreseeably at risk from the danger, then the individual assumes an affirmative duty to exercise reasonable care to either control the danger or protect the vulnerable. West, 172 S.W.3d at 551; Biscan v. Brown, 160 S.W.3d 462, 478-79 (Tenn. 2005). We have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another. See Bradshaw, 854 S.W.2d at 872; McClung, 937 S.W.2d at 895; Lindsey v. Miami Dev. Corp., 689 S.W.2d 856, 860 (Tenn. 1985); Restatement (Second) of Torts § 314A. Similarly, an individual may assume an affirmative duty by coming to the aid of or rescuing another individual. See Lindsey, 689 S.W.2d at 859; Restatement (Second) of Torts §§ 323 & 324. The following example illustrates this concept:

> A is run over by an automobile and left lying in the street. B, seeing A's helpless condition, takes him in his car for the purpose of taking him to a hospital. B drives the car so negligently that he runs into a tree. The collision greatly increases A's original injuries. B is subject to liability to A for so much of the harm to him as is due to the collision.

Restatement (Second) of Torts § 324 illust. 1.

Tennessee courts determine whether a defendant owes or assumes a duty of care to a particular plaintiff by considering public policy and whether the risk of harm is unreasonable. Burroughs v. Magee, 118 S.W.3d 323, 329 (Tenn. 2003); Turner, 957 S.W.2d at 818. Public policy considerations are relevant because "the imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." Bradshaw, 854 S.W.2d at 870.

With respect to whether the risk of harm is unreasonable, we have previously stated that "[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." McCall, 913 S.W.2d at 153. We have also noted that the following factors should be considered in deciding whether or not a risk is unreasonable:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the feasibility of alternative, safer conduct and the relative costs and burdens

associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

McCall, 913 S.W.2d at 153 (citing Restatement (Second) of Torts §§ 292, 293); see Biscan, 160 S.W.3d at 479-80; Burroughs, 118 S.W.3d at 329.

The foreseeability of the harm is a key factor in the equation because, in general terms, "[f]oreseeability is the test of negligence." West, 172 S.W.3d at 552 (quoting Linder Constr. Co., 845 S.W.2d at 178); Hale v. Ostrow, 166 S.W.3d 713, 716-17 (Tenn. 2005). "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" West, 172 S.W.3d at 551 (quoting Linder Constr. Co., 845 S.W.2d at 178). However, foreseeability alone does not create a duty to exercise reasonable care. McClung, 937 S.W.2d at 904. If the risk is foreseeable, then courts should weigh the remaining factors to determine if an imposition of duty is justified. In the end, whether a defendant owed or assumed a duty of care to a plaintiff is a question of law for the court to decide. West, 172 S.W.3d at 550; Stewart v. State, 33 S.W.3d 785, 793 (Tenn. 2000).

**B.**

Turning to the case at bar, the plaintiff argues that all of the defendants helped "put" Mr. Downs in the bed of the truck and this act created a foreseeable and unreasonable risk of harm. The defendants counter that Mr. Downs climbed into the bed of the truck under his own strength and consented to ride there. The Court of Appeals stated that as a matter of law the fact that Mr. Downs was riding in the bed of the truck was of no significance because there is no statutory or common law prohibition against this act. We respectfully disagree with the lower court's rationale. A jury could easily conclude that the dangers of riding unrestrained in the bed of a pick-up truck on an interstate highway are foreseeable and obvious. Indeed, it is common knowledge that riding unrestrained in a vehicle can result in preventable injuries and deaths.[10] See e.g., Maneely v. Gen. Motors. Corp., 108 F.3d 1176, 1180 (9th Cir. 1997) ("If the public recognizes that traveling in the passenger compartment of an automobile without a seatbelt is dangerous, it only follows as night the day that the public also recognizes that riding in the cargo bed of a pickup . . . presents even greater risks."); Roland v. DaimlerChrysler Corp., 33 S.W.3d 468, 470 (Tex. Ct. App. 2000) (affirming a trial court's grant of summary judgment in a products liability case because as a matter of law riding in the bed of a truck is an open and obvious danger); Josue v. Isuzu Motors Am., 958 P.2d 535, 540 (Haw. 1998) (holding "that the dangers of riding unrestrained in an open cargo bed of a pickup truck are obvious and generally known to the ordinary user"). Particularly on an interstate highway, for example, injuries or death can result from falling out of the bed of a truck onto the roadway, hitting the walls of the bed, or being exposed to inclement weather. The obvious danger of harm from

---

[10] We caution, however, that our conclusion that the dangers of riding in the bed of a truck are obvious and foreseeable is limited to the question of foreseeability in this appeal.

putting an intoxicated person in the bed of a truck or voluntarily choosing to ride there is reasonably foreseeable despite the fact that there is no statute or common law rule prohibiting the practice.[11]

Based upon our review of the record and the relevant authorities, we conclude that the question of whether the defendants helped "put" Mr. Downs in the bed of the truck is a genuine issue of material fact that must be resolved by the jury. The nature of the duty the defendants owed Mr. Downs is dependent upon the resolution of that factual issue. For example, if the jury concludes that the defendants placed Mr. Downs in the bed of the truck or assisted him in getting into it, then they owed him a duty to exercise reasonable care to refrain from conduct that creates an unreasonable risk of harm. If, however, the jury finds that Mr. Downs got into the bed of the truck voluntarily without assistance or coercion, but of his own free will, then the defendants did not owe him a duty of care, unless they assumed a duty by taking charge of Mr. Downs because he was helpless or by standing in a special relationship to him.

## C.

The plaintiff insists that even if the defendants had no duty to act to prevent an unreasonable risk of harm, one or more of the exceptions to the "no duty to act" rule apply. First, the plaintiff avers that section 324 of the Restatement (Second) of Torts applies to the defendants. This section provides:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

Restatement (Second) of Torts § 324.

Even though we have never directly addressed section 324 of the Restatement (Second) of Torts, we have previously examined a situation where a defendant "takes charge of" a "helpless" individual. In Lindsey v. Miami Development Corporation, the plaintiff's decedent, who was intoxicated, died after jumping off a balcony and striking her head on the ground while attending a party at the defendant's residence. 689 S.W.2d 856, 858 (Tenn. 1985). After the decedent jumped, the defendant told those gathered around the decedent to "wait a while before you call an ambulance." Id. at 858. While this Court held that the defendant owed the decedent a duty of care

[11] "While compliance with a statutory standard is evidence of due care, it is not conclusive. Such a standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." W. Page Keeton et. al., Prosser and Keeton on the Law of Torts § 36, at 233 (5th ed. 1984).

-10-

because they stood in the special relationship of social guest and host, we noted that "even if no relationship had existed between [the decedent] and the Defendant, the Defendant assumed control of the situation which placed him under the obligation to exercise reasonable care to render aid to [the decedent]." Id. at 860. This Court concluded that the defendant took charge of the decedent when he instructed others to wait before calling for medical assistance. Id.

In Carson v. Adgar, the Supreme Court of South Carolina, addressed a similar factual situation to the case at bar and expressly relied upon section 324 of the Restatement. 486 S.E.2d 3, 5 (S.C. 1997). The plaintiff's decedent and the defendant, who worked together, spent a majority of the day together socializing and consuming alcohol. Id. at 4. The decedent became intoxicated and argued with the defendant as they were driving along a highway. Id. The defendant decided to "put [the decedent] out" of the vehicle on the roadside so that the decedent could "cool off." Id. The defendant drove away for approximately one mile and then returned to where he had left the decedent. However, during that time the decedent had attempted to cross the highway and was struck and killed by another vehicle. Id. at 4-5. The plaintiff argued that the defendant took charge of the decedent when the men left work together to go socializing. Id. at 5.

The South Carolina court concluded that "in order to establish the defendant has 'taken charge of' one who is helpless, the plaintiff must show 'the defendant did more than act, but through affirmative action assumed an obligation or intended to render services for the benefit of another.'" Carson, 486 S.E.2d at 5-6 (quoting McGee By & Through McGee v. Chalfant, 806 P.2d 980, 983 (Kan. 1991)). Applying this reasoning, the Carson court held that the facts did not indicate that the defendant, "through affirmative action, assumed an obligation or intended to render services for [the decedent's] benefit." Id. at 6.

With respect to the "helpless" requirement, the Restatement writers recognized that intoxication can render a person "helpless." See Restatement (Second) of Torts § 324 cmt. b (stating that this section applies "where the actor takes charge of one who is ill, drunk, or made helpless by the act of a third person or a force of nature.") (emphasis added). Likewise, in Colville v. Liberty Mut. Ins. Co., the Appellate Court of Connecticut relied on section 324 and concluded that the plaintiff in that case was "helpless" after consuming alcohol to the point of "semi-consciousness." 748 A.2d 875, 876 (Conn. App. Ct. 2000).

With respect to the plaintiff's first affirmative duty argument, we conclude that whether Mr. Downs was "helpless" and whether the defendants "took charge of" him are genuine issues of material fact that must be resolved by the jury. If a jury finds that Mr. Downs' level of intoxication rendered him "helpless" and that the defendants "took charge of" him, then the defendants owed him a duty to exercise reasonable care in aiding or protecting him. Conversely, if the jury concludes that Mr. Downs was not "helpless" or that none of the defendants "took charge of" him, then section 324 of the Restatement (Second) of Torts has no application.

Here, the record contains ample evidence that Mr. Downs consumed alcohol throughout the night and that he was acting "wild" and became ill. These facts support the conclusion that Mr.

-11-

Downs was intoxicated. However, being intoxicated does not necessarily mean that he was "helpless." For example, the record also indicates that he was able to enter and exit both apartments and the truck's bed under his own strength. Thus, we conclude that whether Mr. Downs was "helpless" is a genuine issue of material fact that must be resolved by the jury.

Regarding the question of whether the defendants "took charge of" Mr. Downs, the record contains evidence that the defendants decided that Mr. Downs should ride in the bed of the truck, and there is evidence that at least Mr. Britt helped him into the bed. On the other hand, the record also indicates that Mr. Downs did not object to riding in the bed of the truck and that he climbed into it under his own strength. Thus, we conclude that whether the defendants "took charge of" Mr. Downs is a genuine issue of material fact that must be resolved by the jury.

Next, we address the plaintiff's argument that Mr. Britt, Mr. Eller, and Mr. Hurdle each stood in a special relationship such that they assumed an affirmative duty to exercise reasonable care in aiding or protecting Mr. Downs. First, the plaintiff contends that "this Court should recognize that Britt had an affirmative relationship with Mr. Downs such that Britt had an affirmative duty to protect Downs from harm under the circumstances" because of their close relationship as best friends and roommates. However, the plaintiff cites no authority supporting her position that friendship, standing alone, gives rise to a duty of care. After reviewing the facts in this case, we conclude that it is not in the public's best interest to impose on Mr. Britt an affirmative duty to aid or protect Mr. Downs solely because he was Mr. Downs' best friend and roommate. These two young men did not stand in any special relationship that we have previously recognized, and there is no evidence that Mr. Downs was dependent on Mr. Britt. Thus, we conclude as a matter of law that Mr. Britt did not assume an affirmative duty by virtue of being Mr. Downs' best friend and roommate.

Alternatively, the plaintiff contends that designated drivers assume an affirmative duty to aid or protect intoxicated passengers. The duties of a designated driver pose an issue of first impression for this Court. On the night the defendants and Mr. Downs went in search of the party, Mr. Eller served as the designated driver for the group and drove Mr. Hurdle's truck. Generally, drivers of a vehicle owe their passengers a duty to exercise reasonable care under the circumstances when driving. See McCall, 913 S.W.2d at 156 (stating that the defendant-driver "owe[d] a duty to act reasonably in light of the inherent dangers associated with driving.").

The plaintiff, however, posits that Mr. Eller owed Mr. Downs more than the customary duty to exercise reasonable care when driving the truck because he was a "designated driver."[12] The plaintiff argues that "[t]here should be a duty for designated drivers to take affirmative actions to keep intoxicated passengers inside the passenger compartment of the vehicle and to ensure that the intoxicated passenger is not abandoned in a position of peril along the journey." We disagree with such a broad imposition of an affirmative duty of care because the public is better served by

---

[12] The Court of Appeals defined a "designated driver" as "one who assumes the duty to remain sober for the purpose of driving others." For purposes of this opinion, we adopt this definition as well.

-12-

encouraging individuals to serve as designated drivers rather than adopting a policy that could potentially discourage the practice.

Other jurisdictions that have considered the duties of designated drivers have likewise declined to impose on designated drivers an affirmative duty to aid or protect intoxicated passengers. See, e.g., Stephenson v. Ledbetter, 596 N.E.2d 1369, 1373 (Ind. 1992) (stating that "[t]o hold a driver liable for the irresponsible actions of an intoxicated passenger would cut against this important social policy of encouraging the use of designated drivers."); Cardella v. Robinson, 903 So. 2d 613, 618 (La. Ct. App. 2005) (reasoning that if designated drivers were imposed with a duty to control intoxicated passengers and prevent them from performing tortious or criminal acts it would have a "chilling effect" on the designated driver movement); Collins v. Thomas, 938 A.2d 1208, 1211 (Vt. 2007) (affirming a trial court's determination that "there is no common law duty on the part of a sober driver to protect an intoxicated passenger from the consequences of the intoxicated passenger's own actions, and that the imposition of such a duty would be inconsistent with the social policy favoring the use of designated drivers.").

This Court has consistently recognized the dangers associated with impaired driving. See West, 172 S.W.3d at 551-52 (stating that "[i]t is common knowledge that drunk driving directly results in accidents, injuries, and deaths.") (footnote omitted); Burroughs, 118 S.W.3d at 332 (noting that "[d]eaths and serious injuries tragically occur every day as the result of impaired drivers who are operating motor vehicles on our roads and highways."). Designated drivers offer a valuable, but limited service to those who become intoxicated. Based on these public policy reasons, we hold as a matter of law that Mr. Eller owed a duty to exercise reasonable care in driving the vehicle and remaining sober while performing this service. Mr. Eller did not, however, assume an affirmative duty to aid or protect Mr. Downs **merely** because of his status as designated driver.

Lastly, the plaintiff avers that Mr. Hurdle assumed an affirmative duty to aid or protect Mr. Downs because he was the owner of the truck and Mr. Downs was a passenger. The group rode in Mr. Hurdle's truck to the Cool Springs mall-area. Because he consumed alcohol, Mr. Hurdle allowed Mr. Eller, who had not consumed alcohol, to drive his truck. Mr. Hurdle rode as a passenger. As a general rule, passengers do not owe a duty of care "to the public to control, or even attempt to control, the operation of a vehicle unless they have a right to do so, either through their relationship to the vehicle itself or to the driver." Grandstaff v. Hawks, 36 S.W.3d 482, 492 (Tenn. Ct. App. 2000). Tennessee Code Annotated section 55-10-311(a) (2004) provides that,

> In all actions for injury to persons and/or to property caused by the negligent operation or use of any automobile . . . within this state, proof of ownership of such vehicle shall be prima facie evidence that the vehicle at the time of the cause of action sued on was being operated and used with authority, consent and knowledge of the owner in the very transaction out of which the injury or cause of action arose, and such proof of ownership likewise shall be prima facie evidence that the vehicle was then and there being operated by

-13-

the owner, or by the owner's servant, for the owner's use and benefit
and within the course and scope of the servant's employment.

This statute creates prima facie evidence of an owner-servant relationship between the owner of the vehicle and the driver. See Godfrey v. Ruiz, 90 S.W.3d 692, 697 (Tenn. 2002) (stating that this statute "is clearly intended to eliminate the difficulty encountered by injured parties who are trying to prove that the driver was operating with the owner's permission at the time of the accident."); Warren v. Estate of Kirk, 954 S.W.2d 722, 724 (Tenn. 1997). The owner may overcome this prima facie case with countervailing evidence "that the driver was in fact operating the vehicle without authority of the owner." Ferguson v. Tomerlin, 656 S.W.2d 378, 381-82 (Tenn. Ct. App. 1983); Warren, 954 S.W.2d at 724.

Thus, pursuant to this statute, if the jury finds that Mr. Eller is liable for Mr. Downs' death, then any liability may be imputed vicariously to Mr. Hurdle provided that the statutory presumption is not overcome. However, an owner of a vehicle is not one of the special relationships that this Court has previously recognized, and we see no reason to impose such a duty under these circumstances. Mr. Hurdle only had the right to control the driver of the truck and not the other passengers. Mr. Hurdle's duty should not be greater than the duty owed by Mr. Eller. The record does not reveal that Mr. Hurdle acted to benefit or render aid to Mr. Downs. Based upon the facts of this case, we conclude as a matter of law that Mr. Hurdle did not assume an affirmative duty to aid or protect Mr. Downs.

**Breach of Duty, Injury or Loss, Cause in Fact, Proximate Cause, and Defenses**

In addition to proving the existence of a duty of care, the plaintiff still bears the burden of proving the remaining elements of negligence: beach of duty, injury or loss, cause in fact, and proximate cause. In light of our decision that this case is inappropriate for summary judgment, the jury should also resolve these remaining elements. In addition, the jury should decide whether Mr. Downs' act of running into a lane of traffic was an independent, intervening cause of his death. See McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991). Lastly, the jury should also decide whether Mr. Downs' negligence, if any, equaled or outweighed the defendants' negligence, if any. Hale, 166 S.W.3d at 718 (stating the allocation of comparative fault is a determination of fact to be made by the jury).

**Conclusion**

In summary, we conclude that there are genuine issues of material fact that preclude summary judgment. Specifically, there are genuine issues of fact relating to how Mr. Downs came to be in the bed of the truck after he became ill. In addition, there are genuine issues of material fact with respect to whether Mr. Downs was "helpless" and whether the defendants "took charge of" him. These issues are material because they determine the nature of the duty of care owed by the defendants to Mr. Downs. We also conclude that the best friend and roommate, designated driver, and owner of the truck did not assume an affirmative duty because they did not stand in any special

relationship to Mr. Downs.  Therefore, we reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings.

Costs of this appeal are taxed to the defendants, Mark Bush, Ryan Britt, Jerry Dane Eller, and Scott Hurdle, for which execution may issue if necessary.

_____

WILLIAM M. BARKER, CHIEF JUSTICE