# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 1, 2015 Session

## DONALD NICHOLS v. KNOX COUNTY, TENNESSEE

**Appeal from the Circuit Court for Knox County**
**No. 343511    Deborah C. Stevens, Judge**

———————————————————

**No. E2014-01566-COA-R3-CV-FILED-NOVEMBER 2, 2015**

———————————————————

On August 13, 2010, following a violation of his probation, Donald Nichols began serving a sentence at the Knox County Detention Facility (KCDF). He was assigned to a second floor cell. The only bed available there was a top bunk. On August 20, 2010, Nichols was subjected to a physical examination by KCDF's medical staff. The staff detailed his medical history as pain in his lower back and extremities, as well as surgeries on his knee, foot, and ankle. On August 27, 2010, while he was asleep, Nichols rolled off his bed and hit the floor. As a result, his head was bloody, and he had intense pain in his neck and back. The on-duty nurse examined him and gave him ibuprofen for pain. In the weeks that followed, Nichols continued to have ongoing pain. He made multiple requests for medical assistance. He had an x-ray on November 5, 2010. That x-ray and a subsequent CT Scan and MRI revealed that he had several cervical fractures as a result of his fall. Through the efforts of his criminal attorney, Nichols was released from KCDF on November 10, 2010. Thereafter, in January 2011, he had surgery and incurred medical expenses of approximately $240,000. He filed a complaint against Knox County, alleging common law negligence. Nichols filed a motion for partial summary judgment. Knox County filed a motion for summary judgment. The trial court entered an order granting Knox County's motion after concluding that the evidence in the case did not support a finding that the acts or omissions of agents of Knox County were the proximate cause of Nichols' fall and resulting injuries. The trial court denied Nichols' motion after determining that, at the time of his surgery and follow-up treatment in 2011, he was no longer incarcerated. The trial court held, pursuant to the authority of Tenn. Code Ann. § 41-4-115 (2010), that a county's responsibility for the payment of one's medical expenses is limited to those incurred by the prisoner while still incarcerated. Nichols appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J. (M.S.), and JOHN W. MCCLARTY J., joined.

Robert R. Kurtz and Jonathan S. Taylor, Knoxville, Tennessee, for the appellant, Donald Nichols.

David S. Wigler, Knoxville, Tennessee, for the appellee, Knox County, Tennessee.

**OPINION**

**I.**

When Nichols was incarcerated, he signed an intake/triage screening form. The document indicated that he suffered from arthritis and/or ulcers and required corrective lenses for his vision. No other medical conditions were indicated. In fact, a box on the form, seeking information regarding other medical or mental conditions, of which the KCDF staff should be aware, was left blank. In his deposition, Nichols maintained, on repeated occasions, that he told KCDF officers he needed a ground floor and bottom bunk assignment.

On August 20, 2010, Nichols was examined by Stephanie Minor, a KCDF nurse. In the clinical history and physical examination report that she completed on August 23, 2010, Nurse Minor noted that Nichols had previously undergone a variety of surgeries, in particular left knee replacement with titanium in 2000 and the insertion of screws in his right foot and ankle in 2009. Nurse Minor also diagnosed other medical conditions, including ailments pertaining to his lower back as well as extremity pain. In the section of her report regarding housing, Nurse Minor wrote "SPECIAL NEEDS [KCDF]."[1] (Capitalization in original.) After his physical examination, Nichols was returned to his second floor cell in Pod 2A. On August 25, Nichols was moved to a second floor cell in Pod 4A. He testified that he shared his cell in Pod 4A with an elderly inmate who had already taken the bottom bunk. As a result, only the top bunk was available for him.

While he was asleep on the night of August 27, 2010, Nichols rolled off of the top bunk and landed on the concrete floor. In his deposition, he confirmed that the distance

---

[1] There is nothing in the report indicating that the "special needs" had anything to do with whether Nichols should be placed in a lower bunk.

from the top bunk to the floor was roughly forty-nine inches. Nichols stated that, after the fall, he could not feel his arms and had blood coming out of a head wound. His cellmate called for help, and a KCDF nurse, Amy Luxford, responded shortly thereafter. Nurse Luxford cleaned Nichols' head and gave him ibuprofen for pain. In addition, he was afforded the opportunity to move to KCDF's medical area while he recovered, but he ultimately declined the offer.

On August 28, 2010, Nichols was again evaluated by a member of KCDF's medical staff, Nurse Selenia Allen. That visit generated a "medical visit form" reciting that Nichols was having a terrible headache, was dizzy when he stood up, had a sharp pain "like a knife" in the back of his head, had to use his hands to pick his head up, and could not open his mouth to eat. Nichols was subsequently prescribed the muscle relaxer robaxin, and KCDF medical staff was instructed to consult a supervisor about an x-ray if his pain persisted beyond ten days. In addition, Nurse Allen included instructions in the medical visit form that Nichols should continue to be housed in a bottom bunk on the bottom floor of the facility. Following this, Nichols returned to his cell. Later that day, however, KCDF medical staff received an emergency call from his cell. Nurse Deanna Jones responded, and her medical visit form states that she found Nichols lying on his left side on a mat on the floor. He claimed to be suffering from neck and head pain related to his fall the day before and said that, as a result of his ongoing pain, he could not sit up or move his head. Officers at the facility put him in a wheelchair and transported him to the medical unit for further observation. In her medical visit form, Nurse Jones noted that Nichols reported pain when she touched his mandible, submandible, and temporomandibular joint. Further, Nurse Jones indicated that he had "posterior cervical pain at C1 and C2." As a result of his pain, which he rated a "10 out of 10," Nichols was unable to exhibit any range of motion in his neck. Ultimately, KCDF medical staff decided to house him temporarily in the medical unit to observe his progress, consult with a supervisor about a possible x-ray of his neck, continue administering robaxin, and to have him rest on a mat on the floor.

The record reflects that Nichols was discharged from the medical unit on August 31, 2010, and placed in a first floor cell in Pod 4A. In the weeks that followed, he submitted a series of "medical care forms," which reiterated his ongoing pain and desire to see a doctor. Eventually, KCDF medical staff responded to his requests and evaluated him again on November 3, 2010. Nurse Minor examined him, indicating in her medical visit form that his left knee needed a cortisone shot, his neck was "pretty stiff," his lower back pain was "pretty bad," and he needed to see a doctor. As a result, Nurse Minor recommended that Nichols be referred to a physician for further review or an x-ray.

3

On November 5, 2010, Nichols was referred to Dr. Glenn Jung. After taking an x-ray, Dr. Jung reported that Nichols had sustained "a fracture through the ring of C1." A subsequent CT scan led to the following observation:

> There are 2 separate fractures involving the ring of C1. There is a comminuted fracture involving the left anterolateral aspect of C1. There is a separate fracture involving the right posterolateral aspect of C1. This extends through the lamina. There is lateral displacement of the fracture fragments with the left lateral mass of C1 being displaced laterally a distance of about 8 mm and the right lateral mass of C1 being displaced laterally a distance of about 4 mm. There is settling of the skull base as a result of the displacement.

Nichols was referred to Dr. Richard Boyer, a neurosurgeon. Dr. Boyer examined him and reviewed his x-ray, ultimately concluding that he would need surgery. In his deposition, Nichols testified that a representative from Knox County informed him that indigent care would pay for the surgery. Prior to undergoing surgery, Nichols was released early from jail on November 10, 2010. The record reflects that his "criminal defense attorney was able to secure his release." Nichols' release form indicates that he left the County's custody "ROR."[2] (Capitalization in original.)

In January 2011, Dr. Boyer surgically fused Nichols' cervical vertebrae at C1 and C2. Two rods were installed in his neck and back, and a bone graft from his hip was used to replace a portion of the crushed vertebrae. Nichols' surgery site required sixty-two staples. Following surgery, he spent four days in the hospital and had to return to Dr. Boyer's office for monthly follow-up appointments. Roughly six months after surgery, however, his neck pain resurfaced, and he had an MRI that revealed additional crushed vertebrae at C5, C6, and C7. In his deposition, Nichols testified that Dr. Boyers mentioned that he might need additional surgery. Nichols stated that he had never experienced any problems with his neck prior to his fall on August 27, 2010.

Nichols incurred approximately $240,000 in medical expenses related to his January 2011 surgery. Knox County did not pay any of his medical bills. He subsequently filed a complaint on August 29, 2011, alleging that Knox County was liable for common law negligence. Specifically, Nichols contended that KCDF employees were negligent (1) in addressing his concerns regarding his confinement and (2) in failing

---

[2] Released on recognizance. There is nothing in the record explaining why an inmate serving a sentence would be released on recognizance.

to take basic safety measures to prevent his fall and subsequent injury. On December 12, 2013, Nichols filed a motion for partial summary judgment, asserting that Knox County had a statutory duty, pursuant to Tenn. Code Ann. § 41-4-115, to pay his medical expenses stemming from the injury he sustained while in custody.[3] On January 27, 2014, Knox County filed a motion for summary judgment, arguing that Nichols could not establish that he was any more likely than any other inmate to fall out of his bunk while sleeping and could not show that any such fall was reasonably foreseeable. Thus, Knox County maintained that Nichols could not establish the proximate cause element of his negligence claim. On July 25, 2014, the trial court entered an order granting Knox County's motion, concluding that "there is absolutely no evidence from which this court could conclude that it was foreseeable that Mr. Nichols would fall from his bunk while asleep because he had a prior injury to his ankle and knee." In the same order, the trial court denied Nichols' motion for partial summary judgment, determining that there was "no allegation that Mr. Nichols was in the custody of Knox County at any time during the medical treatment in 2011." Nichols timely filed a notice of appeal.

Nichols raises the following issues as taken verbatim from his brief:

> Whether the trial court erred in finding that there were no material issues of fact and that [Knox County] was entitled to judgment as a matter of law.

> Whether the trial court erred in denying [Nichols'] Motion for Partial Summary Judgment regarding the reasonable and necessary medical expenses incurred as a result of injuries sustained while [Nichols] was incarcerated in the Knox County Detention Facility under Tenn. Code Ann. § 41-4-115(a) and binding precedent.

(Paragraph numbering in original omitted.)

## II.

Because Nichols' complaint was filed after July 1, 2011, Tenn. Code Ann. § 20-6-101 (Supp. 2014) applies to this case. That statute provides:

---

[3] While this allegation is not contained in his complaint or in two subsequent amendments, it is obvious that this issue was tried with the parties' consent.

In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:

(1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

(2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101. *See also* **Huddleston v. Harper**, No. E2014-01174-COA-R3-CV, 2015 WL 3964791, at *3 (Tenn. Ct. App. E.S., filed June 30, 2015); **Harris v. Metro. Dev. & Hous. Agency**, No. M2013-01771-COA-R3-CV, 2014 WL 1713329, at *3 (Tenn. Ct. App. M.S., filed Apr. 28, 2014); **Wells Fargo Bank, N.A. v. Lockett**, No. E2013-02186-COA-R3-CV, 2014 WL 1673745, at *2 (Tenn. Ct. App. E.S., filed Apr. 24, 2014). In **Harris**, this Court explained our standard of review on appeal:

Summary judgments do not enjoy a presumption of correctness on appeal. The resolution of a motion for summary judgment is a matter of law, thus, we review the trial court's judgment de novo with no presumption of correctness. The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied.

*Harris*, 2014 WL 1713329, at *3 (internal citations and quotation marks omitted). When reviewing a trial court's grant of summary judgment on appeal,

[w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. If the undisputed facts support only one conclusion, then the court's summary judgment shall be upheld because the moving party was entitled to judgment as a matter of law.

*Wells Fargo Bank*, 2014 WL 1673745, at *2 (internal citations omitted).

## III.

In order to establish a valid claim for negligence, a plaintiff must offer proof of the following: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant's conduct fell below the applicable standard of care, amounting to a breach of the duty owed;[4] (3) an injury or loss stemmed from the breach of the duty owed; (4) cause in fact; and (5) proximate cause. *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013). "No claim for negligence can succeed in the absence of any one of these elements." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). In the case now before us, the trial court determined that Nichols' evidence was not sufficient to establish the proximate cause element of his negligence claim.

Proximate cause concerns "whether the policy of the law will extend responsibility for . . . negligent conduct to the consequences that have occurred." *Id.* As a result, proximate cause "puts a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendants' breach, defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005) (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)); *see also* Prosser and Keeton, *The Law of Torts* 266 (5th ed. 1984) ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and are of such significance that the law is justified in imposing liability."). Courts in Tennessee employ a three-pronged test when assessing the issue of proximate cause:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Hale*, 166 S.W.3d at 719 (quoting *Haynes*, 883 S.W.2d at 612). In this case, the most pertinent aspect of the three-pronged test is the analysis regarding foreseeability.

---

[4] Knox County does not expressly concede that there was a breach of duty, but the focus by the parties and the trial court was on the element of proximate causation.

Foreseeability is "the crucial factor in the proximate cause test because, if the injury that gives rise to a negligence case could not have been reasonably foreseen, there is no proximate cause and thus no liability despite the existence of negligent conduct." *King*, 419 S.W.3d at 248 (citing *Rathnow v. Knox Cnty.*, 209 S.W.3d 629, 633-34 (Tenn. Ct. App. 2006)). A risk is foreseeable "if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger" was probable. *King*, 419 S.W.3d at 248 (quoting *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008)).

In the present case, Nichols did not fall while climbing into or out of his bunk. In fact, his fall was not the result of (1) any conscious action on his part or (2) any of his preexisting ailments. Rather, Nichols was injured after he rolled off his bunk while sleeping. While we are cognizant of Nichols' age and medical history, we cannot find any justification for attributing his unconscious fall to his preexisting problems. There is simply no reasonable way to foresee that such preexisting conditions would suddenly cause a sleeping person to fall from his or her bed.

In support of his argument, Nichols has cited fourteen incident reports from other times when KCDF inmates fell from their top bunks. These reports, however, do not reveal any insightful facts helpful in our analysis of this case. Specifically, none of the reports indicate that any of the fourteen inmates fell because of medical ailments similar to those of Nichols. On the contrary, all of these reports merely document the fact that an inmate fell from his or her bunk, with no mention of prior medical history. Nichols, however, contends that these fourteen reports clearly establish that KCDF officials were aware that inmates had fallen from top bunks before. If we were to accept Nichols' reasoning, then KCDF would be liable as an insurer any time an inmate fell from his bunk while sleeping. A fall while sleeping, in and of itself, is simply insufficient to make out the concept of foreseeability required to satisfy proximate cause. Nichols' argument would contradict binding precedent. As the Supreme Court noted in *King v. Anderson County*:

> As Tennessee courts have stated in the past, jails are not insurers of inmate safety, a rule that effectuates the courts' understanding of Tennessee's public policy. To hold otherwise would be to suggest that jails and prisons are in effect strictly liable for all inmate injuries incurred while in custody, a position that would be untenable in practice.

*King*, 419 S.W.3d at 247-48 (internal citations omitted).

While Nichols' accident was unfortunate, the causal connection or nexus between his medical history and his unconscious fall is simply not demonstrated in this record. The record contains no evidence that would indicate it was foreseeable that Nichols would fall in his sleep because of his lingering problems with his back, knee, and ankle. Furthermore, as we have previously noted, there is absolutely no evidence even linking his medical problems to his unconscious fall. Therefore, we agree with the trial court's conclusion that Nichols cannot establish the proximate cause necessary to support a claim of negligence against Knox County. In the words of Tenn. Code Ann. § 20-6-101, Knox County has "[d]emonstrate[d] to the court that [Nichols'] evidence is insufficient to establish an essential element of [his] claim." We hold that the trial court was correct in granting Knox County's motion for summary judgment.

**IV.**

With respect to Nichols' motion for partial summary judgment on his allegation that Knox County is liable for his medical expenses, the trial court denied the motion, relying upon the language of Tenn. Code Ann. § 41-4-115. As a result, our resolution of this issue depends upon statutory interpretation. "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). When interpreting legislative acts, "we presume that every word in a statute had meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated doing so." *Chattanooga-Hamilton Cnty. Hosp. Auth. v. Bradley Cnty.*, 249 S.W.3d 361, 366 (Tenn. 2008) (citing *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005)). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004) (citing *Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993)). If the statutory language is clear and unambiguous, "our obligation is to enforce the written language without reference to the broader statutory intent, the history of the legislation, or other sources." *Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d at 366 (citing *Abels ex rel. Hunt v. Genie Indust. Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006)).

Tenn. Code Ann. § 41-4-115(a) states, in pertinent part, that "[t]he county legislative bodies alone have the power, and it is their duty, to provide medical attendance for all prisoners *confined in the jail* in their respective counties." Tenn. Code Ann. § 41-4-115(a) (emphasis added). The explicit and clear wording of this statute reflects that a county is only liable for the medical expenses of an inmate incurred for

9

medical treatment while that inmate is incarcerated. In the present case, Nichols was released from KCDF custody on November 10, 2010, and did not have surgery until January 2011. The record plainly reflects that he was not incarcerated at the time he received the subject medical treatment.

In *Chattanooga-Hamilton County Hospital Authority v. Bradley County*, Brandon Ramsey was shot by an off-duty police officer after Ramsey fired multiple shots into a bar. 249 S.W.3d at 363. Ramsey was subsequently transported to Bradley County Memorial Hospital before being airlifted to the Chattanooga-Hamilton County Hospital Authority (Erlanger). *Id.* Roughly twenty hours after the shooting, an arrest warrant for Ramsey was obtained, but not served. *Id.* A detective, however, contacted Erlanger, asked that Ramsey be put on a police hold, and faxed a copy of the arrest warrant with a request that the Chattanooga Police Department serve the warrant upon Ramsey's release. *Id*. A police hold was then placed in Ramsey's medical chart, but it was removed two weeks later after the detective was unable to arrange for a guard. *Id.* Thereafter, Ramsey was discharged from the hospital and indicted on three counts of attempted first degree murder, among other charges. *Id.* at 364. Erlanger filed a complaint against Bradley County and the City of Cleveland to recover $117,177.36 for all of the medical services provided to Ramsey. *Id.* All parties to the lawsuit filed a motion for summary judgment. *Id.* The trial court subsequently dismissed the City of Cleveland from the case and granted Erlanger's motion for summary judgment as to Bradley County for the medical services provided from the date Ramsey was admitted to the hospital through the date that the police hold was terminated. *Id.*

Bradley County appealed, and this Court affirmed the ruling of the trial court. *Id*. Thereafter, the Supreme Court granted Bradley County's appeal regarding whether the county was obligated to pay for the cost of Ramsey's treatment. *Id.* The Supreme Court noted that "Ramsey was neither 'confined' in the Bradley County Jail prior to his hospitalization nor, throughout his entire stay, placed under formal arrest by any law enforcement authority within that county." *Id.* at 367. Analyzing the case in light of Tenn. Code Ann. § 41-4-115(a), the Supreme Court reversed the judgment of this Court after determining that "the plain language of the statute does not establish any responsibility on the part of Bradley County for medical services, because Ramsey was not a 'prisoner confined in the jail' when he received treatment." *Id.* In the conclusion of the opinion, the High Court reiterated that an individual being confined in the jail was "a threshold requirement for obligating a county for the expense of medical care and treatment." *Id.* at 368.

In his brief, Nichols relies upon *King v. Anderson County* to support his argument that "the Tennessee Supreme Court has ruled that a county has a statutory obligation to

pay for medical expenses incurred as a result of an injury sustained by the inmate while in custody." In that case, Kenneth King was set to be released from the Anderson County Detention Center, but the individual responsible for processing his release failed to take immediate action. *King*, 419 S.W.3d at 238-39. As a result, King was sent back to his cell, where he was subsequently beaten by a fellow inmate and suffered a fractured nose and severe damage to his eye. *Id.* at 238-40. King filed a complaint against Anderson County alleging negligence, and the trial court subsequently found in favor of King and ordered Anderson County to pay his medical bills. *Id.* at 245. Anderson County later stipulated to pay King's medical expenses, which were incurred after he was freed from custody. *Id.* This Court affirmed the judgment of the trial court, but the Supreme Court subsequently reversed after concluding that King had failed to establish proximate cause on the part of Anderson County. *Id.* at 250. The Supreme Court's analysis focused entirely on the issues of proximate cause and foreseeability. However, the High Court stated at the end of the opinion in a brief paragraph that "[o]ur holding in no way absolves Anderson County of its statutory responsibility to pay for the medical bills King incurred as a result of the injuries he suffered while in custody. That obligation remains." *Id.* at 251 (internal citation omitted).

In light of the extensive statutory interpretation of Tenn. Code Ann. § 41-4-115(a) in *Chattanooga-Hamilton County Hospital Authority*, we find the cursory interpretation of Tenn. Code Ann. § 41-4-115(a) in *King* somewhat troubling. Indeed, it appears as though *King* broadly interpreted the clear wording of Tenn. Code Ann. § 41-4-115(a) to extend county liability beyond paying medical expenses for "prisoners confined in the jail." The statement of the Supreme Court in *King* could be read to mean that a county is obligated to pay for the medical expenses of an inmate that were incurred after he or she was released from custody if the incident requiring medical treatment occurred while in custody. In our view, the terse treatment of Tenn. Code Ann. § 41-4-115(a) in *King* is dicta, which would not abrogate the Supreme Court's holding in *Chattanooga-Hamilton County Hospital Authority* that being confined in the jail is "a threshold requirement for obligating a county for the expense of medical care and treatment." As a result, we decline Nichols' request to use dicta from *King* to broaden the scope of Tenn. Code Ann. § 41-4-115(a) and the holding in *Chattanooga-Hamilton County Hospital Authority*. Thus, we hold that the trial court was correct in dismissing Nichols' motion for partial summary judgment because he was not in custody at the time of the medical treatment for which he seeks reimbursement.

## V.

The trial court's grant of summary judgment to Knox County and denial of Nichols' motion for partial summary judgment are affirmed. Costs on appeal are

assessed to the appellant, Donald Nichols. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.


_____
CHARLES D. SUSANO, JR., CHIEF JUDGE