IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 5, 2019 Session

## MELANIE LEMON v. WILLIAMSON COUNTY SCHOOLS ET AL.

**Appeal from the Circuit Court for Williamson County**
**No. 2017-320      Joseph A. Woodruff, Judge**

————————————————————

**No. M2018-01878-COA-R3-CV**

————————————————————

The plaintiff, a former tenured schoolteacher, sued the Williamson County Board of Education and three administrators alleging that she was forced to resign after the defendants "bullied, stalked, intimidated, and defamed" her during the 2015–2016 school year. She asserted claims for wrongful termination, breach of contract, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. The trial court dismissed all of the claims asserted in the original complaint pursuant to Tenn. R. Civ. P. 12.02(6) for failure to state a claim upon which relief could be granted but permitted the plaintiff to file an amended complaint to revise and restate her claims for breach of contract and intentional infliction of emotional distress. Following discovery, the court summarily dismissed the two remaining claims as asserted in the amended complaint. On appeal, the plaintiff challenges the Tenn. R. Civ. P. 12.02(6) dismissal of her wrongful termination and negligence claims, and the summary dismissal of her claims for breach of contract and intentional infliction of emotional distress. We affirm the trial court's determination the plaintiff's negligence and intentional infliction of emotional distress claims are barred by the Governmental Tort Liability Act and Teachers' Tenure Act, respectively. We have also determined that the plaintiff failed to produce evidence of a compensable injury in her claim for breach of contract. As for the plaintiff's claim of wrongful termination, we respectfully disagree with the trial court's determination that the doctrine of constructive discharge is inapplicable to wrongful termination claims under the Teachers' Tenure Act. Therefore, we reverse the dismissal of the plaintiff's wrongful termination claim and remand this claim for further proceedings. We affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Constance F. Mann, Franklin, Tennessee, for the appellant, Melanie Lemon.

Elisabeth M. Carson, Franklin, Tennessee, for the appellees, Kathryn Donnelley, Denise Goodwin, Mike Looney, and Williamson County Government.

**OPINION**

Melanie Lemon ("Plaintiff") was a tenured, second-grade teacher at Walnut Grove Elementary School in Williamson County, Tennessee at all times material to this action. On June 9, 2017, Plaintiff filed a complaint against the Williamson County Board of Education, Williamson County Superintendent Mike Looney, Assistant Superintendent Denise Goodwin, and Walnut Grove Principal Dr. Kathryn Donnelly (collectively, "Defendants"). As is relevant to the issues on appeal, the Complaint asserted a claim against Dr. Looney, Ms. Goodwin, and Principal Donnelly (collectively, "the Individual Defendants") for intentional infliction of emotional distress, and claims against the Williamson County Board of Education ("the Board") for wrongful termination under the Teachers' Tenure Act, breach of contract, negligence, and negligent infliction of emotional distress.

On October 12, 2017, the trial court found that the Complaint failed to state claims for wrongful termination, negligence, and negligent infliction of emotional distress.[1] Although the trial court found Plaintiff's original claim for breach of contract alleged sufficient facts to make a *prima facie* case, the court found it failed to state a claim for which relief could be granted because the employment contract at issue was not attached to the Complaint as required by Tenn. R. Civ. P. 10.03. Similarly, the court found Plaintiff alleged sufficient facts to state a claim for "outrageous" conduct to support her IIED claim, but it also found Plaintiff failed to attribute the alleged conduct to particular defendants. Therefore, the court dismissed both claims without prejudice and granted Plaintiff leave to amend the complaint to revise and restate these two claims. Plaintiff filed an amended complaint on December 6, 2017, and Defendants filed timely answers.

On June 4, 2018, Defendants filed motions for summary judgment on the two remaining claims, breach of contract and IIED. The trial court granted the motions on September 25, 2018. This appeal followed.

_____

[1] The trial court also dismissed claims for invasion of civil rights, defamation, and false light invasion of privacy, but the dismissal of those claims is not at issue in this appeal.

On appeal, Plaintiff challenges the dismissal of five of her claims: (1) wrongful termination, (2) negligence, (3) negligent infliction of emotional distress, (4) breach of contract, and (5) intentional infliction of emotional distress. Because our review of each decision requires the application of different standards of review, we will address them separately.

## STANDARDS OF REVIEW

A Tenn. R. Civ. P. 12.02(6) motion to dismiss "challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). Resolving a Rule 12.02(6) motion to dismiss requires examination of the pleadings alone. *Id.* "A defendant who files a motion to dismiss 'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action.'" *Id.* (quoting *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010)).

When considering a motion to dismiss, courts "must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Id.* (quoting *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31–32 (Tenn. 2007)). "A trial court should grant a motion to dismiss 'only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.'" *Id.* (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo. *Id.*

This court reviews a trial court's decision on a motion for summary judgment de novo, without a presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, we must make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.*; *Hunter v. Brown*, 955 S.W.2d 49, 50 (Tenn. 1997). In so doing, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment does not bear the burden of proof at trial, it may satisfy its burden of production "either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the*

*summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264 (emphasis in original).

When a motion for summary judgment is made and supported as provided in Tenn. R. Civ. P. 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265. Instead, the nonmoving party must respond with specific facts showing there is a genuine issue for trial. *Id.* A fact is material "if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). A "genuine issue" exists if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

## ANALYSIS

### I.  CLAIMS DISMISSED PURSUANT TO TENN. R. CIV. P. 12.02(6)

The Complaint asserted that Plaintiff "became the target of a plan to coerce her resignation" during the 2016–2017 school year, when she "was continually stalked, bullied, and harassed through meetings, e-mails, and directives." The trial court accurately summarized the alleged conduct as

> disciplining and interfering with [Plaintiff's] charity attempt for a co-worker that took place outside of school; providing her with a false and inaccurate work review for the purpose of forcing a resignation; accusing her of child abuse for the purpose of forcing a resignation; placing cameras in her classroom for the purpose of intim[idating] and forcing a resignation; forcing a human monitor in her class room for the purpose of harassing and intimidating her; threatening the community and/or co-workers for speaking on her behalf; threatening the community that she would not work in the State of Tennessee if they testified on her behalf; telling the community that she has anger issues; telling the community that she is a child abuse[r] with no complaint from the child, or his/her family; and threatening co-workers and other teachers in Williamson County that if they stood up for Ms. Lemon or tried to protest, "remember who signs your paychecks."

The Complaint alleged that Plaintiff was suspended without pay for three days because of the child abuse allegation, and the Board failed to follow the required time frames and provide her with the required documents when she attempted to appeal the decision. It also alleged that Plaintiff resigned on May 12, 2017, because she could no longer endure her working conditions.

Plaintiff asserted that Defendants' conduct made her working conditions "so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to

- 4 -

resign." She claimed this "constructive" discharge was a breach of contract, constituted wrongful termination under the Tennessee's Teachers' Tenure Act, and constituted "outrageous" conduct for purposes of her IIED claim. The trial court found the allegations were sufficient to constitute outrageous conduct and to support a breach of contract claim; however, the court dismissed Plaintiff's wrongful termination claim upon finding that her resignation disqualified her from the Tenure Act's protections:

> [I]n the present matter, [Plaintiff] was neither dismissed nor discharged from her position as a second grade teacher at Walnut Grove Elementary School; but rather, as she admits, [Plaintiff] resigned before these actions could occur. . . . Upon resignation, Ms. Lemon's status as a tenured teacher was terminated, thus removing her from the procedural protections provided by the Teacher Tenure Act for tenured teachers who have been improperly dismissed. Tenn. Code Ann. § 49-5-501 (11)(B)(i). Consequently, it cannot be said that Ms. Lemon was wrongfully discharged in violation of the Teacher Tenure Act.
>
> Nevertheless, the Court acknowledges, under certain circumstances, some resignations may be coerced, thus enabling a court to grant a plaintiff relief for an involuntary resignation; however, the Court's legal research has not discovered, and Ms. Lemon has not cited, controlling law demonstrating the applicability of the doctrine of constructive discharge to the present factual circumstances.

(footnote omitted).

The court also dismissed Plaintiff's negligence and negligent infliction of emotional distress claims after finding Plaintiff failed to allege facts that would remove the Board's immunity under the Governmental Tort Liability Act ("GTLA"):

> [T]he GLTA removes governmental immunity for injuries caused by the negligence of governmental employees. Tenn. Code Ann. § 29-20-205.
>
> . . . . However, Ms. Lemon's Complaint does not state a claim for negligence on behalf of the employees of [the Board] (i.e., the Individual Defendants). Regardless of the fact that Count 3 is captioned "Negligence of County Employees," the averments contained therein do not assert a claim for negligence against the Individual Defendants. Count 3 simply alleges negligence on behalf of the governmental entity, WCS, in allowing the Individual Defendants to behave in the alleged manner . . . . [T]he Complaint only seeks to impose liability on WCS for the alleged intentional acts of its employees (i.e., allowing the Individual Defendants to harass,

- 5 -

bully, stalk, or intimidate Ms. Lemon into resignation). Thus, [the Board's] governmental immunity has not been removed[.]

On appeal, Plaintiff contends the trial court erred in dismissing her claim for wrongful termination because the doctrine of constructive discharge is a well-established proxy for the termination element in any wrongful termination claim. Plaintiff argues on appeal that the constructive discharge violated both her rights under the Tenure Act and her rights under her employment contract with the Board. Plaintiff also asserts that the court erred in finding the GTLA barred her negligence claims because her Complaint alleged that the child abuse investigation was "incomplete, improper, and without merit."

As an initial matter, we find Plaintiff waived any argument concerning breach of contract by constructive termination. Although Plaintiff pleaded constructive termination in support of her claims for wrongful termination and breach of contract, she omitted all reference to constructive termination in her amended complaint. The trial court subsequently dismissed the contract claim on summary judgment—which we address in section II, *infra*. By operation of law, Plaintiff's amended contract claim constituted a voluntary abandonment of the pleadings in the original contract claim. *See Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992) ("[A]n amended complaint supersedes the original complaint, rendering the original of no legal effect, unless the amended complaint specifically refers to or adopts the original."); *Baker v. Louisville & N. Terminal Co.*, 61 S.W. 1029, 1031 (Tenn. 1901) (holding that plaintiff could not base appeal on a ground alleged in the original complaint but omitted from amended complaint).

This principle, however, does not prevent Plaintiff from objecting to the dismissal of her wrongful termination claim based on constructive discharge. Plaintiff filed the amended complaint in response to the trial court's order, which did not grant leave to amend the wrongful termination claim. Although Tennessee's decisional law has not addressed the effect of an amended complaint on claims that were dismissed without permission to amend, federal courts "'refuse to require a plaintiff to replead dismissed claims in order to preserve the right to appeal the dismissal,' particularly because an attempt to reallege the claim would likely be futile." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)). "Federal case law interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee rule." *Harris v. Chern*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000). We find this exception to the waiver rule is well reasoned. Thus, we will consider Plaintiff's allegation of constructive discharge only in relation to her wrongful termination claim under the Tenure Act.

A. Wrongful Termination

Broadly speaking, a claim for "wrongful discharge" is any claim that an employee was terminated in violation of a statutory or contractual standard. *See Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 324 (1972) ("[T]he very concept of 'wrongful discharge' implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will."). Wrongful discharge claims often appear in employment discrimination and retaliatory discharge actions. *See, e.g.*, *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 339 n.1 (Tenn. 2005) (describing employee discrimination and retaliatory discharge claims as "wrongful termination cases which implicate major public policy concerns"). However, such claims are not limited to circumstances of discrimination or retaliation. Instead, an employee "may bring a claim for wrongful discharge under any statute that provides such a claim or under the common law of the state." *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 613 (Tenn. Ct. App. 2007) (citing *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 443–44 (Tenn. 1984)). Under the common law of Tennessee, a discharge is "wrongful" when it "violates 'a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision.'" *Id.* at 613–14 (quoting *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997)).

The purpose of the Tenure Act is, *inter alia*, "to provide teachers stability in employment, to enshrine merit as the basis for that stability and to protect teachers from being fired due to malice or political differences." *Kelley v. Shelby Cty. Bd. of Educ.*, 198 F. Supp. 3d 842, 852 (W.D. Tenn. 2016) (citing *State v. Yoakum*, 297 S.W.2d 635, 638 (Tenn. 1956)). By passing the Tenure Act, "[t]he General Assembly recognized that the efficient administration of the local educational systems of this State requires stability of programs and trained personnel." *Ryan v. Anderson*, 481 S.W.2d 371, 374 (Tenn. 1972).[2] In short, "[t]enure is the public policy of the State of Tennessee" and "any

---

[2] In *McSherry v. City of St. Paul*, the Minnesota Supreme Court reviewed the history of teacher tenure legislation in the United States:

> The bases for [the first state tenure law] were that better talent would be attracted to the teaching profession; that annual contracts theretofore in vogue had not resulted in the elimination of poor, incompetent, and inefficient teachers; that the principle of annual election or appointment was not generally applied to policemen, firemen, or judicial officers, and in the very nature of things should not apply to teachers; that not infrequently the best teachers were discharged for inadequate reasons. . . . The objectives sought have been to protect the teachers against unjust removal after having undergone an adequate probationary period; that the movement itself has for its basis public interest,

(continued . . .)

decision to remove a tenured teacher necessarily implicates these public policy goals." *Kelley*, 198 F. Supp. 3d at 852.

Our courts have recognized illegal or wrongful discharge claims alleging a violation of various state and local tenure acts. *See, e.g.*, *Wells v. Tennessee Bd. of Regents*, 231 S.W.3d 912, 915–16 (Tenn. 2007) (wrongful discharge under university teachers' tenure law); *Haig v. Hoffmeister*, No. C.A. 1197, 1989 WL 12285, at *4–5 (Tenn. Ct. App. Feb. 15, 1989) (wrongful discharge under local tenure act). As is relevant here, educators have succeeded on claims for wrongful discharge when they were fired without just cause, notice, or a hearing. *See McGhee v. Miller*, 753 S.W.2d 354, 356 (Tenn. 1988) (finding teacher was wrongfully terminated when the evidence did not establish just cause); *Gibson v. Butler*, 484 S.W.2d 356, 358–59 (Tenn. 1972) (affirming finding that discharge of teachers was wrongful when they were not provided with notice or a hearing); *City of Knoxville v. State ex rel. Hayward*, 133 S.W.2d 465, 469 (Tenn. 1939) (finding teacher's termination because of her marriage was unauthorized, illegal, and void); *cf. Snell v. Bros.*, 527 S.W.2d 114, 119 (Tenn. 1975) (affirming award of damages for violation of non-tenured teacher's statutory employment rights); *Kelley v. Shelby Cty. Bd. of Educ.*, 751 F. App'x 650, 655–56 (6th Cir. 2018) (finding that teachers were entitled to damages when the termination process violated the Tenure Act).

Here, the Complaint alleged that the Board terminated Plaintiff in violation of the Tenure Act because there was no just cause for her termination and she was provided with no notice or hearing. As the above authority indicates, this allegation alone would state a prima facie case for wrongful termination; however, what makes this case unique is that Plaintiff alleged that the Board *constructively* terminated her. The trial court correctly noted that there is no controlling law concerning the doctrine of constructive discharge in a wrongful termination claim based on an alleged violation of the Tenure Act's provisions. Nonetheless, we find Plaintiff provided sufficient persuasive authority to prevent us from foreclosing the possibility that a constructive discharge could violate the Tenure Act.

As Plaintiff argued before the trial court and on appeal, "constructive discharge recognizes that some resignations are coerced and that employers should not be permitted to escape liability [for wrongful discharge] simply because they forced an employee to resign." *Frye*, 227 S.W.3d at 611–12 (quoting *Walker v. City of Cookeville*, No. M2002-

---

in that most advantages go to the youth of the land and to the schools themselves, rather than the interest of the teachers as such.

277 N.W. 541, 543–44 (Minn. 1938).

01441-COA-R3-CV, 2003 WL 21918625, at \*7 (Tenn. Ct. App. Aug. 12, 2003)). Like express termination, a constructive discharge is wrongful when it constitutes "a breach of an express or implied contract of employment" or a "violation of fundamental public policy." *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1030 (Cal. 1994) (citations omitted). Thus, in Tennessee, the doctrine of constructive discharge has been recognized in employment discrimination claims, *see, e.g.*, *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 33–34 (Tenn. 1996); retaliation claims, *see, e.g.*, *Crews*, 78 S.W.3d at 865; and breach of contract claims, *see, e.g.*, *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 94 (Tenn. 1999).

In her opposition to Defendants' Motion for Summary Judgment and on appeal, Plaintiff cited to *State ex rel. McGhee v. St. John*, 837 S.W.2d 596 (Tenn. 1992) as a case where the Tennessee Supreme Court recognized the "constructive discharge" of a public school teacher. While the facts and controlling law in *McGhee* differ from the present case, we find the Court's reasoning in *McGhee* persuasive. The plaintiff in *McGhee* was a high school teacher who had been harassed, intimidated, and ultimately dismissed without just cause after she refused to inflate the grades of the high school's star athlete. *See McGhee v. Miller*, 753 S.W.2d 354, 354–55 (Tenn. 1988). Although the Court ordered the county school board to reinstate the teacher to her previous position, *id.* at 356, the board attempted to assign her to an elementary school when she returned from leave, *State ex rel. McGhee*, 837 S.W.2d at 598. The plaintiff refused the assignment and brought a claim for breach of contract and violation of the State Leave Act, Tenn. Code Ann. § 49-5-705. *Id.* at 599. On appeal, the Court found the assignment constituted a constructive discharge, *id.* at 602, reasoning that if the teacher were denied her statutory rights, she would "finally be eliminated altogether from the . . . school system, which is exactly the result intended by those who originally clamored for her discharge," *id.* at 601.

The Board asserts that constructive discharge is applicable only in circumstances of federal labor disputes and retaliatory discharge. It argues that "the Tenure Act does not contemplate" application of the doctrine of constructive discharge and its provisions "cannot be overridden by [Plaintiff's] attempt to transplant an analytical framework from a wholly distinct area of law." Moreover, the Board contends that *McGhee* does not support a "new cause of action for 'constructive discharge' in the context of the Tenure Act." Respectfully, we find these arguments miss the gravamen of the constructive discharge doctrine, which is simply a legal fiction that prevents an employer from achieving a desired result without complying with its statutory or contractual obligations. A board of education cannot violate the fundamental policies of the Tenure Act by coercing a resignation any more than it can violate the fundamental policies of any other statute by coercing a resignation.

- 9 -

Even if an allegation of constructive discharge is permissible under the Tenure Act, the Board argues that Plaintiff failed to allege facts to support a finding that her working conditions were so severe, pervasive, and intolerable that a reasonable person would resign; and it is entitled to immunity under the GTLA. Although the Board raised these grounds in its Motion for Summary Judgment, the trial court did not address them.

Nonetheless, the trial court found that, taking the Complaint's allegations as true, Plaintiff sufficiently pleaded "outrageous conduct" to support her IIED claim. "Outrageous conduct" is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Considering that Plaintiff's intentional infliction of emotional distress claim is predicated on the same conduct as her wrongful discharge claim, we find Plaintiff sufficiently pleaded working conditions "so intolerable that a reasonable person subject to them would resign." *See Campbell*, 919 S.W.2d at 34.

As we noted earlier, when considering a motion to dismiss, "courts 'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" *Webb*, 346 S.W.3d at 427 (quoting *Tigg*, 232 S.W.3d at 31–32)). Additionally, courts "should grant a motion to dismiss 'only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.'" *Id.* (quoting *Crews*, 78 S.W.3d at 857). Thus, we conclude the Complaint stated a claim of constructive discharge for which relief could be granted.

We also respectfully disagree that the GTLA applies, because Plaintiff's claim is based on an alleged violation of a statute that expressly prohibits termination without just cause, notice, and a hearing. *See Vaughn v. City of Tullahoma*, No. M2015-02441-COA-R3-CV, 2017 WL 3149602, at *3 (Tenn. Ct. App. July 21, 2017) (concluding another statute's specific provisions controlled over the GTLA's general provisions). To hold otherwise would cloak a school board in immunity anytime it violated the Tenure Act's provisions.

Accordingly, we reverse the dismissal of the plaintiff's wrongful termination claim and remand this claim for further proceedings.[3]

---

[3] In finding that Plaintiff stated a claim of wrongful, constructive discharge, we do not comment on the merits of the claim. We simply find that dismissal at the pleading stage was unwarranted.

## B. Negligence and Negligent Infliction of Emotional Distress

Although the trial court did not address the application of the GTLA to Plaintiff's wrongful discharge claim, it determined the GTLA barred her claims for negligence and negligent infliction of emotional distress. We agree.

When a plaintiff attempts to hold a governmental entity liable for the intentional acts of its employees, as Plaintiff does here, a direct showing of negligence by the governmental entity is required. *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 368 (Tenn. 2011). In other words, a governmental entity cannot be held liable for an intentional tort "absent proof of its negligent supervision." *Id.* at 355. To state a claim for negligent supervision, a complaint must allege that the defendant had notice of the wrongdoer's propensity to harm, authority to prevent the harm, and a duty of care to those who were harmed. *See Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 454 (Tenn. 2012) (quoting Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. Rev. 1789, 1856 n.266 (2004)).

While Plaintiff's negligence claims asserted that the Board breached its duty to "control, direct, and train their employees," i.e., the Individual Defendants, it failed to allege facts that would show the Board had notice of the intentional conduct that harmed Plaintiff. Without notice of the Individual Defendants' conduct, the risk of harm to Plaintiff was not foreseeable. *See King v. Anderson Cty.*, 419 S.W.3d 232, 248 (Tenn. 2013) ("A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." (quoting *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008))).

Although Plaintiff alleged that she complained about Principal Donnelly's behavior to Assistant Superintendent Goodwin, she also alleged that Ms. Goodwin intentionally participated in the conduct that injured her. The Board cannot be held liable for Ms. Goodwin's negligent supervision of her own intentional conduct. *See Bundy v. Madison Cty., Tenn.*, No. 14-1337, 2015 WL 1957094, at *3–4 (W.D. Tenn. Apr. 29, 2015) (finding county was immune under the GTLA when the complaint alleged simultaneously that the county's sheriff negligently supervised its employees and participated in the intentional acts that lead to plaintiff's constructive discharge).

Based on the foregoing, we affirm the trial court's decision to dismiss Plaintiff's claims for negligence and negligent infliction of emotional distress.

## II. CLAIMS DISMISSED ON SUMMARY JUDGMENT

The two claims that were revised and reasserted in the Amended Complaint, one for intentional infliction of emotional distress and the other for breach of contract, were dismissed on summary judgment following substantial discovery.

In support of their motion for summary judgment Defendants submitted a Joint Statement of Undisputed Material Facts that included 248 "material undisputed facts." In response, Plaintiff filed a statement of additional material facts, which included 524 "material undisputed facts." As a result, the "undisputed material facts" submitted by the parties comprised over 400 pages. Having reviewed the record, we have determined that the vast majority of the undisputed and disputed facts relied upon by the parties are not material or constitute legal conclusions, and only a modest number of the facts relied on by the parties are material for the purpose of summary judgment as it pertains to these two claims.

The facts that are most relevant to the claims of breach of contract and intentional infliction of emotional distress are generally stated and summarized as follows. At a Back-to-School night on August 24, 2016, Plaintiff met with the mother of a student whose behavior had been particularly challenging ("Mom One").[4] During the meeting, Mom One became upset because she felt like Plaintiff was suggesting that something was wrong with her son. Plaintiff asked Principal Donnelly to join the meeting and, according to Plaintiff, Principal Donnelly immediately blamed Plaintiff for upsetting Mom One. The next day, Plaintiff met with Principal Donnelly to discuss how Principal Donnelly had allegedly disrespected her. Later that morning, Plaintiff and Principal Donnelly met again, this time with Assistant Principal Gaidos in attendance. That meeting focused on how Principal Donnelly and Ms. Gaidos could provide Plaintiff with more support in her classroom.

Plaintiff testified that Principal Donnelly treated her differently from other teachers after the Back-to-School night by closely scrutinizing and directing Plaintiff's classroom management through frequent e-mails, conversations, and meetings. In her deposition, Principal Donnelly admitted to monitoring Plaintiff's classroom closely, but she explained that she did so because of the large number of reported behavior incidents in Plaintiff's classroom and parent complaints. In particular, Mom One and another parent ("Mom Two") were unhappy with how Plaintiff assigned homework and enforced discipline. Principal Donnelly asked Plaintiff to accommodate their requests and to

---

[4] The names of parents were redacted from the record to protect the privacy of their children.

increase communication with several families by writing bi-weekly e-mails. Although Plaintiff initially complied with this directive, her compliance was inconsistent. Consequently, in late 2016, Principal Donnelly contacted Assistant Superintendent of Human Resources, Rebecca Owens, with "some concerns about insubordination" related to Plaintiff's failure to comply with the e-mail directive.

In January 2017, Walnut Grove Assistant Principal Debbie Gaidos conducted a routine, in-class evaluation of Plaintiff. For the first time in fourteen years, the majority of Plaintiff's scores were below average.[5] Because Plaintiff suspected that she was being targeted for termination, she contacted her Tennessee Education Association ("TEA") representative, Antoinette Lee, who scheduled an informal meeting with Assistant Superintendent Goodwin. At the February 27, 2017 meeting, Plaintiff detailed how she felt Principal Donnelly was "bullying" her and stated that she did not respect Principal Donnelly. Plaintiff and Ms. Lee requested all future concerns with Plaintiff's performance be communicated through Ms. Lee or with Ms. Lee present. They all agreed to schedule a more formal meeting at a future date. The meeting, however, was never scheduled.[6]

After the February 27 meeting, Ms. Goodwin relayed to Principal Donnelly that Plaintiff "did not respect" Principal Donnelly. Ms. Goodwin also told Principal Donnelly that future communication was to go through the TEA representative, Ms. Lee, who was also to be present at any future meetings with Plaintiff. Ms. Goodwin also told Principal Donnelly to notify Ms. Goodwin about future concerns. Pending the unscheduled meeting with Ms. Lee and Plaintiff, Principal Donnelly stopped scheduling meetings with Plaintiff and withheld a "strong" guidance letter she had prepared for Plaintiff about the failure to follow the e-mail directive. Whenever Principal Donnelly had a concern about Plaintiff's actions, she would note the occurrence without confronting Plaintiff. On one particular day, Principal Donnelly noticed that Plaintiff arrived almost four minutes late for school. Principal Donnelly notified Ms. Goodwin of Plaintiff's tardy arrival but did not approach Plaintiff about it. Ms. Goodwin asked Principal Donnelly to keep track of future arrival times to see if there was a pattern.

---

[5] Ms. Gaidos performed two "walk through" evaluations in March, one on March 8 and one on March 14. Plaintiff's "walk through" scores were higher than her January evaluation scores, with none falling below average.

[6] According to the deposition testimony, it appears that Ms. Lee, Ms. Goodwin, and Ms. Donnelly expected the others to schedule the meeting.

Matters took a turn for the worse on March 9, 2017, when Mom Two allegedly saw Plaintiff respond in frustration to the child of Mom One. Plaintiffs' class was lining up in the hallway for a school play, and the students were "wiggling with excitement." Although all the students were acting this way, Plaintiff allegedly turned to Mom One's child, got on her knees, placed the child's hands by his side, and said, "STOP IT." Mom Two believed the reaction was inappropriate, but she did not report the incident because she already had a history of complaints against Plaintiff.

A month later, Mom One confided in Mom Two that she believed Plaintiff had been unfairly singling Mom One's child out for discipline. Mom Two immediately recalled the March 9 incident and revealed what she had seen. Both Mom One and Mom Two decided the incident was relevant to Mom One's concern about the unfair targeting of her child. The next day, Mom Two called Principal Donnelly to report the incident.

After ending the call with Mom Two, Principal Donnelly immediately reported the incident to Ms. Goodwin and Ms. Owens. According to Ms. Goodwin, Principal Donnelly called and reported an allegation of "inappropriate touching" based on Plaintiff's use of physical redirection in "frustration and anger." According to Ms. Owens, Principal Donnelly reported an allegation that Plaintiff "grabbed a child." Ms. Owens instructed Principal Donnelly that Ms. Owens would handle communications with Plaintiff regarding the allegation, directed Principal Donnelly to report the incident to the School Resource Officer, Torrey Shelby, and obtain a written statement from Mom Two. Ms. Owens said that they would have to discuss the allegation with Superintendent Dr. Looney, but the protocol would be to suspend Plaintiff pending an investigation. Ms. Gaidos then called Mom Two and obtained a written statement from her.

Principal Donnelly called Officer Shelby and told him an allegation had been made against Plaintiff concerning the "grabbing" of a child. When Officer Shelby and Principal Donnelly reviewed the surveillance camera activity for March 9, 2017, they realized that the alleged incident occurred in an area that was not in the camera's view. Based on the details of the allegation, Officer Shelby immediately determined that no law enforcement investigation was necessary.

Back at the Central Office, Ms. Owens and Ms. Goodwin told Dr. Looney about Plaintiff's alleged use of "physical contact . . . to discipline a student." Dr. Looney instructed Ms. Owens to investigate the matter and signed a letter informing Plaintiff that she was being suspended pending an investigation. Ms. Owens contacted Plaintiff's TEA representative, Ms. Lee, to discuss the suspension; however, Ms. Lee was out of town, so she requested that Ms. Owens not discuss any substantive matters with Plaintiff until she returned.

The next afternoon, Thursday, April 13, 2017, Ms. Owens called Plaintiff about the allegations. Plaintiff listened to the call on speakerphone with a co-worker. According

- 14 -

to Plaintiff and her co-worker, Ms. Owens told Plaintiff she "was under investigation with the Sheriff's Department and [Department of Children's Services] for child abuse." In her deposition, Ms. Owens denied that she said "child abuse" during the phone call but admitted that she told Plaintiff the matter had been reported to law enforcement.[7] Ms. Owens informed Plaintiff that she was being suspended pending the investigation and arranged to meet with Plaintiff on the following Monday.

On the morning of Monday, April 17, 2017, Plaintiff and her husband met with Ms. Owens. Although they attempted to gather details about the allegations, Ms. Owens provided only generalized information because Ms. Lee was not present. She did, however, present Plaintiff with the letter from Dr. Looney, which stated that Plaintiff was being suspended without pay pursuant to Tenn. Code Ann. § 49-5-511(a)(3),[8] pending an investigation into allegations that she "grabbed a student and forced his arms down." The letter further provided that the allegations, if substantiated, would constitute a violation of Board Policy 5.611, Ethical Practice for Teachers. Ms. Goodwin stated that suspension without pay was "normal protocol" when there were "allegations of abuse" and reiterated that the allegations had been "reported to the sheriff." Ms. Goodwin stated that the school would investigate once the law enforcement investigation was complete. Ms. Goodwin explained several times that Principal Donnelly was not handling the report at the school level because the parent "alleged child abuse."

The next day, April 18, 2017, Ms. Goodwin provided a copy of Mom One's written statement to Ms. Lee and requested an investigatory interview with Plaintiff. On Thursday, April 20, 2017, Plaintiff and Ms. Lee met with Ms. Owens to give a verbal and written statement. Plaintiff told Ms. Owens that she did not remember the incident but that she often used physical touch to redirect students. Plaintiff also stated that she had to discipline Mom One's child often.

Ms. Owens reported to Dr. Looney that Plaintiff "admitted to touching the child and to redirecting his shoulders, and she said she did it often." Ms. Owens believed that Plaintiff's admissions corroborated Mom Two's allegations, and determined that Plaintiff had violated the Board's Ethical Practices policy. She recommended that Plaintiff be

---

[7] Ms. Owens testified that she did not know that Officer Shelby had declined to investigate or that his report would have been only "informational."

[8] Tenn. Code Ann. § 49-5-511(a)(3) provides, in relevant part, "A director of schools may suspend a teacher at any time that may seem necessary, pending investigation or final disposition of a case before the board or an appeal."

suspended for three days. Dr. Looney agreed and directed the placement of cameras and a teacher assistant in Plaintiff's classroom.

One day later, on Friday, April 21, 2017, Ms. Lee and Plaintiff returned to the Central Office to meet with Ms. Owens and Ms. Goodwin. During the meeting, Ms. Owens presented Plaintiff with a formal, written reprimand signed by Dr. Looney. The letter stated Plaintiff was being suspended for three days without pay for violating the Ethical Practices Policy, applied retroactively to the days Plaintiff was suspended pending the investigation. The letter also warned Plaintiff that additional violations of the policy would warrant consideration of discipline, including termination. The letter informed Plaintiff she had a right to appeal the suspension and request a hearing within 10 days. Ms. Goodwin informed Plaintiff that cameras would be placed in the classroom to protect her from further false allegations.

On Monday, April 24, 2017, Plaintiff returned to her classroom, which was now wired with two cameras. Then, without notice, a teacher assistant showed up to monitor the class. In her deposition, Plaintiff testified that she did not know how to explain her absence, the cameras, or the teacher assistant's presence to the students.

A rumor that Plaintiff had been charged with child abuse quickly spread. When Mom Two and Mom One heard the rumor, they each sent an e-mail to the school administration. Mom Two wrote Principal Donnelly and Ms. Gaidos, clarifying that she "would not classify" what she saw "as child abuse" and that "[i]f my statement justified child abuse, then I feel that my verbiage was unclear." Similarly, Mom One wrote to Ms. Owens, stating that her concern had been with "how [Plaintiff] singled [her child] out" and he was always in trouble—not that Plaintiff had committed child abuse. Responding to Mom One, Ms. Owens stated that she was "not aware of [Plaintiff] being charged with child abuse," but explained that the school administration had "reporting obligations" when presented with "allegations of abuse."

Shortly after Ms. Owens gave Plaintiff the suspension letter, Ms. Lee arranged for Plaintiff to receive legal representation from the TEA and appeal the suspension. On May 1, 2017, Plaintiff's TEA attorney, John Allen, sent a letter to Dr. Looney requesting a conference under Tenn. Code Ann. § 49-5-512(d)(2).[9] The letter also asserted that

___

[9] Tenn. Code Ann. § 49-5-512(d)(2) provides, in relevant part:

Upon request made in writing within five (5) days from the date of the suspension letter or the date it was received, whichever is later, the director shall provide a conference with the director at which the teacher may offer rebuttal to the charges or any information the teacher wishes the director to consider.

Dr. Looney had not complied with Tenn. Code Ann. § 49-5-512(d)(1), which required him to provide Plaintiff with "copies of any documents relied upon" in deciding to suspend her.

Although the investigation had concluded, concerns remained in the administration about Plaintiff's struggles with classroom management. Thus, Ms. Goodwin became concerned when she saw surveillance video that showed Plaintiff was on her computer for an extended period instead of instructing the students. She also noted that Plaintiff had not called on a child who had his hand raised, and Plaintiff was out of the room when two children got into a beanbag fight. Based on these observations, Ms. Owens and Ms. Goodwin went to see Dr. Looney again on May 2, 2017. Dr. Looney—who had access to the school surveillance cameras—pulled up the video feed from Plaintiff's classroom.[10] After seeing Plaintiff on her computer, he sent Plaintiff an e-mail with one line: "Concerned about you leaving the room unattended and spending so much time on your computer." Plaintiff, feeling like her every move was being monitored, contacted Mr. Allen and told him that she wanted to resign.

Mr. Allen contacted the Board's General Counsel about Plaintiff's resignation, and he requested the Board waive the usual 30-day notice period, reverse Plaintiff's three-day suspension, and compensate her for the three days of missed pay. On May 11, 2017, Mr. Allen notified Plaintiff that the Board had agreed to her resignation but only on the condition that she finish the school year as a substitute teacher outside of Walnut Grove Elementary.

The next afternoon, May 12, 2017, Plaintiff submitted her resignation letter, effective May 24, 2017.[11] In her deposition, Plaintiff testified that she wanted to continue her appeal but "wasn't allowed" to finish the process because of the resignation.

Based on the above and other evidence in the record, the trial court concluded that Plaintiff's claim for breach of contract was barred due to her failure to follow the grievance procedures in the Memorandum of Understanding ("MOU") or file an appeal of the suspension. The court reasoned that the MOU's grievance procedures were "clearly intended to be the exclusive mechanism for educators to use when complaints

---

[10] During his deposition, Dr. Looney testified that this was the only time he viewed the camera feed from Plaintiff's classroom.

[11] The record contains no copy of the resignation letter or any other memorialization of its terms.

arose," and found Plaintiff had conceded that she knew her resignation "would result in a forfeiture of her grievance."[12]

On Plaintiff's amended IIED claim, the court determined that the Individual Defendants were entitled to summary judgment because the Tenure Act provided immunity "from all liability stemming from the investigation of [Plaintiff] which led to her suspension." Moreover, the court found that the Individual Defendants' actions amounted to "insults, indignities and petty oppressions" but did not amount to the degree of outrage required for a viable claim of IIED.

On appeal, Plaintiff argues that the trial court's decision overlooks the "implied covenant of good faith and fair dealing" in the Teachers' Bill of Rights, Tenn. Code Ann. § 49-5-209. Plaintiff also contends that the MOU does not require teachers to exhaust the grievance process before seeking judicial relief and, even if it does, the Board repudiated this requirement by forcing Plaintiff to abandon her appeal in exchange for her resignation.[13] As for the dismissal of her IIED claim, Plaintiff asserts that the Tenure Act's immunity clause does not apply to the Individual Defendants because they were not "performing their duties" when they coerced her resignation. Further, Plaintiff maintains that the false accusation of child abuse was "per se outrageous" because it constituted a criminal act under Tenn. Code Ann. § 37-1-413.[14]

---

[12] Although Plaintiff's deposition testimony was equivocal on whether she knew her resignation would result in forfeiture of her appeal, the trial court found Plaintiff's trial counsel conceded the matter at oral argument.

[13] As discussed in section I.A., *supra*, Plaintiff also argues that the Board breached the MOU by constructively discharging her. Because we find Plaintiff waived this issue when she filed her Amended Complaint, we decline to address it.

[14] Tenn. Code Ann. § 37-1-413 provides:

Any person who either verbally or by written or printed communication knowingly and maliciously reports, or causes, encourages, aids, counsels or procures another to report, a false accusation of child sexual abuse or false accusation that a child has sustained any wound, injury, disability or physical or mental condition caused by brutality, abuse or neglect commits a Class E felony.

A. Breach of Contract

The Amended Complaint asserted that the Board breached its contract with Plaintiff, as memorialized in the MOU between the Board and the Williamson County Educational Association ("MCEA").[15]

Plaintiff alleged that the Board violated the Article VIII, Section 8.1(a) of the MOU, Student Discipline Procedures, which provided, "The Board recognizes its responsibility to give all reasonable support and assistance to educators with respect to the maintenance of control and discipline in the classroom." Plaintiff asserted the Board breached its duty under this provision when it failed to provide her with support or protection, despite knowing that nine out of the 18 students in Plaintiff's class required special attention and one student, in particular, needed verbal and physical redirection throughout the day.

The Amended Complaint also alleged that the Board violated Article X, Section 10.1 of the MOU, Educator Conduct and Disciplinary Procedures, which provided, in relevant part:

**Section 10.1 Definitions**

.    .    .    .

Disciplinary action shall be for just cause and may include the following:

1. Oral reprimand (documented but not placed in the personnel file)

2. Written reprimand

3. Suspension

4. Dismissal of an educator, which is governed by T.C.A. § 49-5 Part 5.

.    .    .    .

**Section 10.4 Notice of Deficiencies**

---

[15] For the purposes of summary judgment, the Board conceded at oral argument that the Memorandum of Understanding was a contract.

- 19 -

In addition to the progressive discipline described in Section 12.1 above, the Board recognizes the concept of progressive improvement. In the event an administrator determines that an educator has deficiencies in his or her work, that administrator may, outside the evaluation process, notify the educator in writing of any alleged deficiencies, indicate expected correction, propose an improvement plan specifying necessary improvements or needed actions, and indicate a reasonable period of time for correction.

(emphasis added). Plaintiff asserted that the Board breached these provisions because it suspended her without just cause; failed to take "progressive" disciplinary action; and failed to give her an opportunity for progressive improvement.

Further, the Amended Complaint alleged that the Board violated Article XI, Section 11.1 of the MOU, Complaints, which provided in relevant part:

Any written complaint regarding an educator made to any member of the administration by a parent, Student, or other person shall be investigated by the administrator and the following steps shall be taken:

.     .     .     .

d.     The educator shall be given an opportunity to respond to the complaint and meet with the complainant and the immediate supervisor upon educator request, in order for the educator to rebut the complaint.

Plaintiff asserted that the Board breached this provision by failing to provide her a right to confront the parent who accused her of child abuse.

In addition to the MOU, the Amended Complaint alleged that the Board violated its Anti-Harassment Policy, which provided the Board would "maintain a learning and working environment that is free from harassment of any type"; its Complaints and Grievances Policy, which provided the Board would "be fair and just to all parties to a dispute, irrespective of the influence, location or length of residence, race or any other factors"; and its implied duty of good faith and fair dealing.

To begin with, we find Plaintiff has waived her arguments concerning the Board's duty of good faith and fair dealing under the Teacher Bill of Rights, Tenn. Code Ann. § 49-5-209. In its Motion for Summary Judgment, the Board addressed the Teacher Bill of Rights "out of an abundance of caution" because Plaintiff purportedly identified the statute during discovery, as a source of contract rights. Plaintiff did not, however, raise it as a basis for her contract claim in the Amended Complaint. Accordingly, the trial court

declined to address it. Regardless, we find the dispositive issue is whether Plaintiff put forth evidence of damages caused a breach of contract.

A claim for breach of contract requires "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998)). Plaintiff's Amended Complaint seeks compensatory and punitive damages, and alleges the Board's breach of contract was "the proximate and legal cause of Plaintiff['s] compensatory damages" including "lost back pay, lost front pay, lost benefits, humiliation, and loss of reputation in the community, employability, and embarrassment." Except in some narrow circumstances, which do not apply, neither punitive damages nor damages for mental anguish are recoverable in a contract action. *See Johnson v. Women's Hospital*, 527 S.W.2d 133, 141 (Tenn. Ct. App. 1975) ("The general rule is that punitive damages are not recoverable in a contract action and neither are damages for mental anguish[.]").

Mental anguish includes loss of reputation. *See Reitz v. City of Mt. Juliet*, No. M2016-02048-COA-R3-CV, 2017 WL 3879201, at *2–3 (Tenn. Ct. App. Aug. 31, 2017) (finding no authority for awarding damages for impairment to reputation, personal humiliation, and mental anguish and suffering in action for breach of contract). Additionally, front pay is not recoverable in a breach of contract action. *See Sircy v. Metro. Gov't of Nashville & Davidson Cty.*, 182 S.W.3d 815, 821 (Tenn. Ct. App. 2005) (finding that plaintiff was entitled to damages only for "damages resulting from" the breach of contract, which did not include front pay). Thus, the only damage claimed by Plaintiff that is recoverable in an action for breach of contract is for lost back pay.

It is undisputed that Plaintiff finished the 2016–2017 school year as a substitute teacher and was paid for the three days of lost salary in exchange for her resignation. Consequently, we find Plaintiff has failed to show she lost any back pay.

To the extent Plaintiff has sustained emotional injuries and consequential damages in lost front pay, her remedy for those injuries lies in her tort claim for wrongful termination. *See Sasser v. Averitt Exp., Inc.*, 839 S.W.2d 422, 433 (Tenn. Ct. App. 1992) (explaining that the remedy of front pay may be appropriate in wrongful discharge claims when reinstatement is not feasible).

## B. Intentional Infliction of Emotional Distress

Plaintiff contends that the Individual Defendants were not entitled to immunity under the Tenure Act because (1) the Individual Defendants committed a felony by

falsely accusing Plaintiff of child abuse; and (2) the Individual Defendants were not "performing their duties" when they coerced her resignation.

"The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). On appeal, the only conduct that Plaintiff relies on to establish outrageous conduct is the false accusation of child abuse. Thus, we find the dispositive issue is whether the Individual Defendants were entitled to immunity under the Tenure Act for claims related to the accusation, investigation, and suspension.[16]

The Tenure Act provides that "[t]he director of schools or other school officials shall not be held liable, personally or officially, when performing their duties in prosecuting charges against any teacher or teachers under this part." Tenn. Code Ann. § 49-5-512(b). This immunity is absolute. *Buckner v. Carlton*, 623 S.W.2d 102, 104 (Tenn. Ct. App. 1981), *superseded by statute on other grounds*, Act of May 24, 1984, Tenn. Pub. Acts, ch. 972, 1026, *as recognized in Lucas v. State*, 141 S.W.3d 121, 129, 137 (Tenn. Ct. App. 2004)). Thus, "the officer is immune from suit even though malice or corruption is present." *Id.* Nonetheless, immunity "applies only where the [defendants] were acting within the scope of their duties as school officials prosecuting the [teacher]." *Id.* at 105.

In *Buckner v. Carlton*, a school principal sued his assistant principal and superintendent for bringing false charges against him for, *inter alia*, misappropriation of school funds and conspiring to testify falsely during the investigation. *Id.* at 103. Although the Complaint alleged that the defendants brought the charges in bad faith, we found the Tenure Act provided immunity to the defendants. *Id.* at 106. Looking to the criminal justice system for guidance, we noted that "public prosecutors generally enjoy absolute immunity from suit for acts related to the instigation and prosecution of criminal charges." *Id.* at 104 (citing 52 Am. Jur. 2d *Malicious Prosecution* § 67 (1970)). We explained that immunity was justified by the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 104–05 (quoting *Imbler v.*

---

[16] Because Plaintiff did not raise the issue of whether the Individual Defendants committed a "felony" in the trial court, we find the issue is waived. *See, e.g.*, *Wilson v. Esch*, 166 S.W.3d 729, 730 (Tenn. Ct. App. 2005) (holding that party may not raise an issue for the first time on appeal).

*Pachtman*, 424 U.S. 409, 422–23 (1976)). Thus, "a teacher faced with the possibility of a loss of job and professional reputation might readily conclude that school officials are out to 'get' him or her, and thus retaliate with a lawsuit after the hearing has concluded." *Id.* at 105. Accordingly, in *Padgett v. Clarksville-Montgomery County School System*, we found a human resource officer was immune from suit for an alleged libelous statement in her final investigation report because it was "part of the prosecutorial functions of her job." No. M2017-01751-COA-R3-CV, 2018 WL 5881766, at *6 (Tenn. Ct. App. Nov. 9, 2018); *see also Monce v. Marshall Cty. Bd. of Educ.*, 307 F. Supp. 3d 805, 821–22 (M.D. Tenn. 2018) (interpreting § 512(b) as prohibiting an action against a director of schools under the Tenure Act for allegedly imposing a long-term disciplinary suspension outside the bounds of her authority); *Jacox v. Memphis City Bd. of Ed.*, 604 S.W.2d 872, 874–75 (Tenn. Ct. App. 1980) (finding school officials were immune from suit arising out of their preparation of charges and testimony in support).

Based on the foregoing, we find the Tenure Act protects the Individual Defendants from liability for their participation in the investigation and prosecution of Plaintiff.[17] Accordingly, we affirm the trial court's summary judgment on this claim.

### IN CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the parties evenly.

FRANK G. CLEMENT JR., P.J., M.S.

---

[17] Plaintiff also argues that the GTLA, Tenn. Code Ann. § 29-20-201(b)(2), provides for the removal of immunity for government authorities whose conduct "amounts to willful, wanton, or gross negligence." However, the Tenure Act's specific grant of immunity takes precedence over the GTLA's provision that is more general. *See Padgett*, 2018 WL 5881766, at *6.